IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

UNITED STATES OF AMERICA,)
                         )
           vs.           )   CRIMINAL CASE NO.
                         )   8:22-cr-00380-LKG
JASON MICHAEL LEIDEL,    )
           Defendant.    )
_____)   10:42 a.m.

WEDNESDAY, JANUARY 17, 2024
Courtroom 3B
Greenbelt, Maryland

TRANSCRIPT OF PROCEEDINGS
DETENTION HEARING
BEFORE THE HONORABLE TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE

For the Government:

P. Michael Cunningham, Esquire
US Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, MD 21201

For the Defendant:

Gary E. Proctor, Esquire
Jennifer Smith, Esquire
Law Offices of Gary E. Proctor, LLC
223 East Redwood Street, Suite 1000C
Baltimore, MD 21202

Also Present:

Celine Ferguson, Pretrial Services
Amos Tang, FBI Special Agent
_____

(Proceedings Recorded by Audio Recording - Transcript Produced
by Computer-aided Transcription)

Reported by: Amanda L. Longmore, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland  21201
410-962-4474

P R O C E E D I N G S

(10:42 a.m.)

THE CLERK:  All rise.  The United States District Court for the District of Maryland is now in session.  The Honorable Timothy J. Sullivan presiding.

THE COURT:  All right.  Good morning.  Everybody have a seat.  Government, call the case.

MR. CUNNINGHAM:  Good morning, Judge Sullivan.  Calling the case of the United States versus Jason Leidel, Criminal Docket Number 22-cr-0380.  Michael Cunningham for the United States.  With me at counsel table is FBI Special Agent Amos Tang.  We're here for a detention hearing this morning.

MS. SMITH:  Good morning, Your Honor.  Jennifer Smith with Gary Proctor on behalf of Mr. Jason Leidel who is seated to my right.

THE COURT:  All right.  Good morning to all of you as well.  From Pretrial, who's with us?

MS. FERGUSON:  US Pretrial Services Officer Celine Ferguson.  Good morning, Your Honor.

THE COURT:  Officer Ferguson, how you doing?

All right.  So we were last together on December 7th where Mr. Leidel consented to detention, reserving his right to have a hearing.  I assume that the Government's still persisting in detention in this case?

MR. CUNNINGHAM:  Correct, Your Honor.

THE COURT:  All right.  Do you want to go first?  Do you want the defendant to go first?

MR. CUNNINGHAM:  Judge, I'll go first.  Maybe it will frame things a little more.

THE COURT:  Sure.

MR. CUNNINGHAM:  Just to summarize the Government's position, back in January of 2023, Mr. Leidel had a hearing. He was originally arrested in late October of 2022, charged by complaint, subsequent indictment.  He was detained for a period of time, and counsel had petitioned for a hearing in front of then Judge Xinis to whom the case was assigned.  And in early January she released Mr. Leidel to the third-party custody of his parents and with rather strict conditions.

The entry of Document 40 spells out what those very strict conditions were, specifically a strict limitation on the access to the Internet and the parents were to swear out that they would remove Internet-capable devices and ensure that he was not afforded any access.  Then he was released to their custody.

As indicated in the affidavit that was submitted -- excuse me -- in support of applications for search warrants in the Middle District of Pennsylvania back in early December and attached to the motion the Government filed to revoke the conditions of release, it's the Government's contention that Mr. Leidel subsequently engaged in a number of incidents that

spell two things.

One, I would submit that there's probable cause to believe that he committed other crimes; specifically, either a -- both, obstruction, obstructive behavior, as well as continued stalking-like behavior.

In addition, it's clear and convincing evidence that he violated the conditions of release specific to access to the Internet, contact with potential witnesses, as well as more recently, and this is not part of the affidavit, but violating the restrictions that were imposed or were the authorization that was afforded to him to travel.  And I'll summarize that by way of proffer, but obviously the Agent's here.

Very briefly, Your Honor, just to kind of summarize what the Government's position is, and I acknowledge that most of the violations that are contained in the affidavit occurred earlier in the time frame of Mr. Leidel's release back in the January, February, March, time frame of 2023.  It was the investigation of those and essentially gathering data in order to perform analysis on it and, in some ways, forensic analysis on it to enable the Government to represent that we thought that there was probable cause to believe and/or clear and convincing evidence of these violations that prompted both the search as well as the Government's motion to revoke in December of this year.  It began shortly after the -- Mr. Leidel's release.

There was an unusual request that had been submitted purportedly from -- and I'm going to use the initials just to protect Mr. Leidel's ex-wife.  And I'm sure Your Honor is probably familiar with this, but for the record, Mr. Leidel remains involved in a Domestic Relations litigation down in -- I'm not sure exactly what the jurisdiction is.  It's in the Norfolk, Virginia area with his now ex-wife and there were children involved.

I will represent that I have counseled the agents and I have even spoken to both the third-party -- excuse me, the guardian ad litem for the children, as well as counsel for his ex-wife that we, the Government in this context, are assiduously avoiding anything that might suggest that we're taking a position one way or the other in that domestic litigation.  It is clearly beyond the scope of any responsibility or authority that we have and we're very much doing our best to avoid that.

However, certain things are relevant in that context, specifically travel and communication, and to the extent that there have been times when Mr. Leidel has requested authority to travel for litigation purposes, the Government has consented to that I think, you know, appropriately so.

But to go back to the -- sort of the summation, shortly after his release, this unusual request was submitted purportedly from ES, the ex-wife, to -- and it was a FOIA

request to the FBI, which, again, the FBI investigated, determined from ES that she had not submitted this. It was an -- submitted from IP address that essentially engaged in obfuscation of what the original source was. That happened on the 17th of January of 2023, shortly after his release on or about the 9th of January.

Within about two weeks after that was an e-mail that purportedly came from an individual named Peter -- I'm not sure how to pronounce the name -- Imbrogno, who was the guardian ad litem for the children involved in the I guess custody litigation and support litigation in Virginia.

Now, to be clear, I had previously communicated with Mr. Imbrogno I think maybe telephonically and/or electronically regarding certain things including the fact that Mr. Leidel was taken into custody back in the November -- October, November of 2022 time frame just to make sure that he was aware of what was going on.

But this -- and it's laid out in detail, in exact detail in the affidavit, but it was an e-mail from Mr. Imbrogno purporting to implicate Special Agent Kevin Kuo, who was the previous case agent on this case, and myself in inappropriate conduct, including releasing information and such, which, in and of itself this affidavit was false in that the information hadn't been released; but secondarily, the IP address of that communication resolved to the same IP address as the one from

Ms. -- from -- supposedly from ES two weeks earlier, this obfuscation e-mail.

The e-mail from Mr. Imbrogno, and Mr. Imbrogno is an attorney, and if you look at it, it's written in a way that's similar to a number of the incidents that form the underlying charges in this case where Mr. Leidel would create a communication and intentionally write it in a way that it contained typographical errors, grammatical errors, clearly suggesting that it was written by someone not as intelligent and capable as Mr. Leidel is. Mr. Imbrogno did not write that e-mail and I would submit that it was, again, submitted in the context of trying to interfere with the investigation by casting aspersions on the case agent and the prosecutor.

Thereafter in February ensued a number of -- or at least spoofed e-mail to Sarah Sorg. Now, Sarah Sorg was originally charged in the complaint. She was not included in the indictment. Sarah Sorg, prior to his arrest in 2022, was the on-and-off partner of Mr. Leidel. They had cohabitated for a period of time, and she was originally charged in the complaint with engaging in some conduct that formed the underlying stalking charge.

The info -- or excuse me, the communication to Sarah Sorg came to the Government's attention because her attorney turned it over to the Government. Forensic analysis of that revealed it -- the sender had used Emkei, which is a fake e-mailer

originating out of Czechoslovakia. Emkei was also used by Mr. Leidel in the underlying charges. So there's a similarity there. And the Navy was able to confirm that, although the e-mail purported to come from ES's Navy e-mail account, in fact, it did not and it was not authorized to do.

In or around the same time frame in February, Sarah Sorg received a text message from a phone number that ended in 4136. We're not sure where the 4136, who actually had it. It was a Voice over Internet Protocol transmission. And it essentially was a very cryptic message. Again, it's included in the affidavit, it says "Have Brian call me." Brian is, we speculate, refers to Sarah Sorg's ex-husband whose first name is Brian.

Simultaneous with that, what the agents discovered was that -- and there was sort of a three-prong analysis that's notwithstanding the fact that Mr. Leidel was essentially not supposed to have any -- any Internet-capable communications devices, T-Mobile confirmed that he had and still has, or at least as of -- excuse me -- as of April 2023 had an active T-Mobile account to which a phone number was assigned.

And an analysis of the communications that were sent to -- the text communications that were sent to Sarah Sorg showed that it was sent via Pinger. And immediately in the same time frame after that, Pinger communications were sent to the phone number assigned to Sarah Sorg, the communications were all --

excuse me -- another text was sent to the phone number that T-Mobile confirms is subscribed to by Mr. Leidel.  So the Government's position is that this essentially was, you know, he was verifying, sent it to Sarah Sorg, I'm also sending it to myself.

The iPhone, there was an iPhone in Mr. Leidel's possession when he was initially arrested in late October of 2022. Unfortunately, and call it a, you know, investigative oversight, but that phone was not seized at the time of his arrest.  And it subsequently has not come into the Government's possession, at least according to Mr. HL, Mr. Leidel's father, who was one of the third-party custodians.  Upon being asked about that phone, he claimed it was turned over to Mr. Leidel's counsel for some other litigation.

We understand from counsel, and I'm not trying to get into any privileged communications, but it's my understanding from counsel that they don't have that iPhone.  So essentially the iPhone that had been in Mr. Leidel's possession at the time of his arrest we can't account for at this point in time.

But with regard to the communications to Sarah Sorg, I would submit that it was -- there's certainly clear and convincing evidence and probable cause to believe that it was Mr. Leidel using a communication device to reach out in violation of the terms of his release and potentially to communicate with Sarah Sorg who's a potential witness.

They -- the fifth incident that's referenced is that in the affidavit was an e-mail purportedly sent to me by ES, the defendant's ex-wife, in late March of 2023.  And again, the content of this e-mail is included in the affidavit.  It is an e-mail which, obviously, if it were true, it would seriously undermine the credibility of ES and, in fact, arguably defeat any charges against Mr. Leidel by virtue of impugning her credibility and integrity.

One, the agents interviewed ES and, indeed, she denies basically sending this particular e-mail.

Two, it's used -- it used the same Emkei fake e-mailer as the earlier submissions to which I alluded as well is the same kind of -- sort of process that the defendant employed in the underlying charges to mask communications that he was sending not only to ES but to a variety of other recipients that essentially clearly not only impugned the character of ES but intentionally caused emotional distress to her.

But finally, the actual content of the e-mail is simply false.  It's not an accurate account.  The Government certainly has never countenanced any of the -- any conduct that would constitute any lies or misrepresentation by anyone, whether it's a Government witness or not, and we're not certainly aware that ES engaged in any sort of deceptive communications to the Government, provided any false information or anything of the sort, and if we discovered that, not only would the defense

learn of that as -- as, you know, Brady material, but it would obviously cause the Government to examine the charges.  So that, again, the Government attributes that communication in an attempt to obstruct this case to the defendant because of the similarity of things.

I alluded to one other aspect that's not included in the original motion to revoke or the affidavit because at the time we hadn't finalized the information, but earlier I mentioned the Government has tried to be accommodating when necessary for the defendant to engage in the litigation involving child custody.

In early October of 2023, he had requested via counsel the authority to travel to the Norfolk, Virginia area for a proceeding in that matter and the Government consented.  The Judge's order authorized him to travel for purposes of that litigation.

In the course of that, the Government discovered that the defendant had gone to a school where one of the children was a student, and it's the Government's position that he exceeded the scope of his authorized travel there, and under the circumstances, especially given the very strict constraints that were imposed on him by Judge Xinis when she authorized his release, this was essentially a bold-faced violation of those conditions.

The -- with regard to the phone or the access to

Internet-capable devices, the Government, when it executed the search warrants at his parents' residence, as well as the vehicle that he was operating in early December, they took the opportunity to interview his father, one of the third-party custodians, because the analysis -- excuse me, the analysis of certain accounts, IP addresses, Internet IMEI device identifiers suggested that a phone that was assigned to an e-mail account assigned to the father appeared to be involved with some of these transmissions.

And suffice it to say, it's the Government's position that the father engaged in some conduct which basically was suspicious and suggested that -- that he had violated the conditions of -- that were imposed on him as a third-party custodian and afforded Mr. Leidel the opportunity to use any Internet-capable device, finding the conditions of his release required the parents to confirm that Internet-capable devices would be removed from the house.

Specifically, what the Government discovered was that within about a month after Mr. Leidel -- well, strike that. If I could back up.

Shortly after Mr. Leidel was released from custody, the Government discovered that a number of applications were downloaded onto Mr. -- the father's Internet-capable devices, including but not -- not totally, things called DuckDuckGo, a Mobile Jump VPN-Super Unlimited Proxy, and certain other

applications that are used in the context of trying to mask or obfuscate the origin of communications.

Mr. HL was asked why he did that, and he had some rather ambiguous contentions why he did it, girls at work told him to do it. Also, within about a month after his son's release from custody, Mr. Leidel and HL changed the phone number of his phone. And not that there's obviously any prohibition on doing that, but in this day and age, we all recognize that, if anything, what we want to do is import phone numbers if we have to change a service provider. It's always much more convenient to keep your phone number. Changing your phone number creates more problems, and I would submit that it actually is suspicious behavior.

Originally, Mr. Leidel, HL, the custodian, denied having used any of these applications, even though they were downloaded at the recommendation of unknown people at work, he denied using them. When the agents confronted him and said, well, there's evidence clearly that they were used on your phone, he basically in, again, an ambiguous way said he used them but then they were deleted from the phone.

He also acknowledged, though, that he had provided the phone to the defendant and ostensively for doing things like proofreading on the phone and Pinger checks but, again, even handing an Internet-capable device to Mr. Leidel was a violation of what he had represented to Judge Xinis were the

conditions under which he would satisfy.

Now, this isn't about the quality of supervision provided by the previous third-party custodians, but it's indicative of the fact that the Government believes that if not both, at least one of the parents, probably HL, was in collusion with the defendant in enabling him access to an Internet-capable device.

On the day in question, when they executed the search warrant on 7 December of 2023, the agents discovered some really -- again, I would suggest it was misleading communication from HL about the location of his phone, that he'd left it at work or -- and then he had to go back and found it and stuff, which was in the Government's position indicative of essentially a consciousness of guilt on his part that that phone contained evidence of his complicity in this conduct.

Your Honor, may I have one moment to consult with counsel -- or I mean the Agent?

THE COURT:  Sure.

(Pause in Proceedings.)

MR. CUNNINGHAM:  Your Honor, just to add, Agent Tang reminded me that we -- the agents via process have recovered records from Apple, from Pinger, from T-Mobile, all of which would support the representations I made regarding the communications and why we attribute them to the defendant in this case.

And I would submit essentially that as represented in the motion to revoke, this is clear and convincing evidence of his violations that previously included in previous conditions of release, and that there's probable cause to believe that he has, in fact, engaged in other criminal conduct.  Obviously charges have not been brought, but certainly that's under consideration.

Judge, unless you have any questions specific, I'll submit.

THE COURT:  No.  Thank you very much.  Yes, ma'am?

MS. SMITH:  Thank you, Your Honor.  And because identity is at issue here, whether or not he was the one that was sending all of these, because the Agent is here, there are a couple of questions I would like to ask him, if that is okay if I can --

THE COURT:  No.  Go ahead.

MS. SMITH:  Okay.  Your Honor, to begin with, at the end of the day, there is nothing tying --

THE COURT:  Is your position really -- look, let me -- is your position really what you said in your papers that your client has nothing to do with this and he hasn't stepped a foot awry and I guess it's his father, the third-party custodian that's doing all this?  Is that your position?

MS. SMITH:  Your Honor, I --

THE COURT:  I'm just asking.

MS. SMITH:   My position is that there is nothing I have seen in here that ties it directly back to Mr. Leidel.

THE COURT:   Was he living in the house in Scranton?

MS. SMITH:   Your Honor, he was living at that house --

THE COURT:   Was he living in the house in Scranton?

MS. SMITH:   He was living in the house in Scranton.

THE COURT:   Okay.

MS. SMITH:   When they executed the search warrant, they did a full search of the house.  They did not -- there was no WiFi in the house.  His mother was there, she let them look through his phone.  His father was there, he handed over his phone.  All of these things occurred.

THE COURT:   Did he hand over the iPhone that Mr. Cunningham was talking about that dad might have left at work or whatever that he -- did dad hand that over at the search warrant?

MS. SMITH:   Your Honor, they had a full search of the house.  I don't know -- I'm not aware of where that iPhone is.

THE COURT:   Okay.

MS. SMITH:   But it was not in the house.  Mr. Leidel had no idea anyone was coming to the house that day.  There was no reason for him to have gotten rid of the phone if the phone was in the house at that day.

Your Honor, looking through the first two allegations,

they come back to a similar user agent.  What the user agent says is that it's an iPhone 13 using DuckDuckGo with a certain operating system.  Your Honor, the iPhone 13 was the best-selling phone of 2022.  Over 100 million people own iPhone 13s.  Your Honor --

THE COURT:  In Scranton?

MS. SMITH:  There is nothing in this search warrant that indicates that it was coming from Scranton.  There was an -- there was a VPN being used, but there is nothing that said --

THE COURT:  Do you dispute that there were Internet-capable devices in the residence at the time of the search?

MS. SMITH:  I dispute that there were any Internet devices that were connected to the Internet.

THE COURT:  That's not what I asked, Ms. Smith.  I said capable of being connected.  There were Internet-capable devices at the residence.

MS. SMITH:  My understanding is that there was a television that was not -- that the agents looked at, tested to see if it was connected to the Internet and it was not connected to the Internet.  My understanding was that there was a PS5, a Playstation 5 that was at the home not connected to the Internet.

So there were devices as all of us -- most people's

televisions are capable of connecting to the Internet, but there was no WiFi-capable devices -- no WiFi-capable devices that were actually attached to the Internet.

THE COURT:  But there were iPhones -- were there iPhones in the residence?

MS. SMITH:  There were iPhones in the residence but they --

THE COURT:  Capable of Internet connectivity?

MS. SMITH:  But it put specifically in the order Judge Xinis ordered that they had to be password protected, that she wasn't going to make his parents give up their telephones.  Most people don't have landlines.  Most people rely on cell phones for communication.  That wasn't a part of the order his parents couldn't have iPhones.  It was just that they had to be password protected and when the search was executed both of the -- both of his parents' phones were password protected.

In regards to the e-mail to the Emkei accounts, the e-mails that were sent from an Emkei account, first of all, the Government just blatantly says he was found to have, you know, used Emkei accounts before.  We are deep into this case.  I've looked through discovery.  I have not seen anything that says, okay, this Emkei comes back on one of his devices.  They asked the USUHS, which is the medical facility that he was working at, whether or not someone could access that website, and they

said, sure, they could access that website on our systems, but there was no evidence that Mr. Leidel had accessed that website.

Finally, well, the Pinger communication, the text messages that were sent to Sarah Sorg and Mr. Leidel, Sarah Sorg and Mr. Leidel were in a relationship for I believe two years, and so the fact -- the mere fact that the same phone number texted both him and Ms. Sorg at the same time isn't enough to say, oh, he must have been testing to see if it sent because it's very probable that someone who was trying to contact Sarah would also try to contact Mr. Leidel.

Your Honor, the other thing, so the Government has made proffers that E████ -- I apologize, ES, the -- Mr. Leidel's ex-wife has made representations that I got this, I didn't send this e-mail.  I -- again, I haven't received discovery yet in regards to this search warrant to what was collected in support of this search warrant, but I don't know if they are just -- if the Government is just accepting her contention that, yes, I didn't send this, or if they're actually subpoenaing her devices or subpoenaing her records.  I have no evidence, I've received nothing that indicates that there was verification on their end that she was not the one sending these things.

THE COURT:  Except for the fact that she said -- if I understood Mr. Cunningham correctly, that she told the agents that she never submitted a FOIA request to the FBI.

MS. SMITH:  Correct.  And I'm not saying that their -- I'm saying that it's her contention, right?  She is telling them I didn't do this and it's being accepted.

THE COURT:  She's a victim, the alleged victim in this case, not a defendant, right?

MS. SMITH:  That is --

THE COURT:  She has no -- she has no restrictions on whatever she wants to do.

MS. SMITH:  And that is correct, Your Honor.  But if she is saying that I didn't sent this, they -- and Mr. Leidel is going to be the target, the alleged victim and Mr. Leidel are ex-spouses.  They have children in common.

THE COURT:  So are you saying -- I mean, I'm just trying to figure this issue out.  I'm not into the weeds like all of you are on this.

MS. SMITH:  Yeah.

THE COURT:  But are you trying to posit the supposition that ES is sending e-mails and/or texts to somehow blame or frame her ex-husband, the defendant in this case; is that what you're saying?

MS. SMITH:  Your Honor, what I am saying is I don't know if it's her, I don't know if it is someone else.  I haven't seen any -- any kind of verification that it is not other people sending these -- these things when they're allegedly coming from certain e-mail addresses.

THE COURT:  But isn't there some evidence -- I guess, Mr. Cunningham, we can go through the records or whatever -- but they're coming from an IMEI that's in the residence in Scranton?  Isn't that provable?

MR. CUNNINGHAM:  At least some of the communications.

THE COURT:  Maybe not all of them, but some of them.

MR. CUNNINGHAM:  Right.  Yes.

THE COURT:  Okay.  All right.  Which kind of narrows the world of who might be doing this, right?

MS. SMITH:  And again, I apologize, I have read through this multiple times, and I am seeing -- the first time the IMEI number is mentioned is when they say we got his father's phone records, but the user agent strings that they're using to connect the first two, the FOIA request and the complaint that was sent by Imbrogno, that those are being identified through user agent strings and that phone's user agent strings are --

THE COURT:  I don't even know -- I got to tell you, I don't even know what you're talking about.  You're like talking Czech to me.  No pun intended.  I don't know what a user -- I have no idea what you're talking about.  I mean, I'm just being honest.  Go ahead.

MS. SMITH:  And Your Honor, I mean, again --

THE COURT:  So what's a user agent string?

MS. SMITH:  Again, this is why I wanted to call the

Agent.

THE COURT:   But you know we go by proffers here.   We don't put on evidence.   Go ahead.

MS. SMITH:   The user agent string essentially allows them to say what the identification of the model of phone, the browser that's being used, and the version, like the software version on that phone.   And what that is identifying is an iPhone 13, the DuckDuckGo browser, and the current version of the -- you know, the Apple, like, operating system.

THE COURT:   Yeah.   So but no long string of numbers like an IP address or an IMEI or anything else that would link that to any other location?

MS. SMITH:   Correct.   That's my understanding of what the user agent string is.   And so that's my contention is, yes, they have his Apple records but there's no direct connection, my understanding, between the user agent strings that say it is this specific device.

THE COURT:   But who's -- look, and I meant to ask Mr. Cunningham this and he can -- I'll ask him.   Then who's doing this?   It's the same cast of characters involving the same universe of conduct coming from somewhere in Scranton, Pennsylvania, so it's not -- I mean, it seems -- it -- somebody is doing this, and unless there's like another conspiracy out here to frame your client, then it's either your client's dad or your client.   I mean, that's just logic, right?

MS. SMITH:  And Your Honor, the -- part of my argument is, looking through this, there is nothing in here that specifically ties this back to Scranton, Pennsylvania.  In fact, their -- one of the e-mails, the last e-mail that was sent, and again, I don't have the raw data of this, but it lists the e-mail there in the header, it lists an IP address, and that IP address comes back to Columbia, Maryland.  And I don't have the data to send to an expert to say what is this IP address but, again, that IP address is resulting back to Columbia, Maryland.  So --

THE COURT:  which one of the e-mails is this that you're referring to?

MS. SMITH:  That is the spoofed e-mail from ES's e-mail account to AUSA Cunningham on March 24th, 2023.

THE COURT:  Okay.

MS. SMITH:  And Your Honor, my final argument -- argument is that the last incident here was 10 months ago.  That's the last alleged incident.  We are not suggesting that Mr. Leidel go back and live with his parents.  His sister who is a nursing student is here in the courtroom today.  She doesn't even have the Internet at her house.  She's -- like I said, she's a nursing student, she does most of her work at the school, comes home, relaxes.  She would be the proposed third-party custodian.

We would contend that with the -- with the strict

restrictions that he was under that that would reasonably --

THE COURT:  Didn't Judge Xinis already try that, though?  Here's the problem, right?  So Judge Xinis released him back into the community under very strict conditions of release on January 3rd, 2023.

So whether this conduct began on January 19th of 2023 and bled into February or March of 2023, he was on and under her conditions of release at the time.  You don't disagree with that, do you?

MS. SMITH:  No.

THE COURT:  And they were very clear that he wasn't to use any computer systems or anything like that.  And the problem that I have, and I read your pleading, is that how do I trust now another -- because I think the dad is good for it, all right?  Let me just be honest.  I think the dad either allowed his son to use the devices and/or turned a blind eye to it because I don't believe the dad did it on his own.

So my problem is, despite the good intentions of your now-proposed third-party custodian, how do I -- how do I trust this family to abide by these very stringent no-computer, no-Internet-capable devices, how do I trust that your -- one, under 3148, your client's capable of either complying with these release conditions, because it's all too suspicious to me that this occurred with the same cast of characters all involved in the case and there can only be one spoke of this

wheel or hub of this wheel, and so it's either the -- my opinion, for whatever it's worth, probably not much, it's either the dad or your client.  So how am I to trust some other family member to make sure that your client doesn't find himself in this position again?

MS. SMITH:  Your Honor, the third-party custodian, she is here, Cassandra.

THE COURT:  I see her, yeah.

MS. SMITH:  She is in nursing school.  She's not going to risk being held in contempt of court.

THE COURT:  What does their dad do?

MS. SMITH:  I believe he works at like a corner store.

(Pause in Proceedings.)

MS. SMITH:  Okay.  So Your Honor, and again, Ms. Leidel -- I believe his father works like in -- near the home, I believe potentially as a clerk, like a records clerk.  But again, Ms. Leidel is --

THE COURT:  So he -- the dad was gone during the day to work.

MS. SMITH:  Correct.

THE COURT:  And your client was home alone.

MS. SMITH:  Correct, on --

THE COURT:  Which is the same scenario now that your client will be home alone while she's in nursing school.

MS. SMITH:  Correct.  And she will have her phone with her.  She has no Internet.

THE COURT:  Does she have an iPhone or Android that's capable of Internet connectivity?

MS. SMITH:  I do not know.  Can we ask her?

THE COURT:  Absolutely, you can ask her.

MS. SMITH:  She has an iPhone.

THE COURT:  Okay.  And she's a nursing student but she doesn't have a computer or a laptop or any Internet connectivity wherever she lives?

MS. SMITH:  Your Honor, can I have her answer these --

THE COURT:  Sure, yeah.

MS. SMITH:  -- questions because I --

THE COURT:  Seems weird to me because like everybody has Internet.  Like, schools are virtual now.

Okay.  Ma'am, can I ask you to raise your right hand?

(Cassandra Monique Leidel was duly sworn.)

THE COURT:  What's your full name, please?

MS. LEIDEL:  Cassandra Monique Leidel.

THE COURT:  So you heard Ms. Smith, do you -- what Internet-capable devices do you own or have access to?

MS. LEIDEL:  I have a Macbook and I have an iPhone.

THE COURT:  All right.  So you have a lap -- you have a Mac laptop, correct?

MS. LEIDEL: Yes, sir. Um-hmm.

THE COURT: Okay. That connects to the Internet?

MS. LEIDEL: Yes, sir.

THE COURT: And you have an iPhone that connects to the Internet?

MS. LEIDEL: Yes, sir.

THE COURT: Okay. And what's your -- basically, what's your class -- what's your daily life?

MS. LEIDEL: Well, I go to school an hour away from my home. I go to school or clinical. I do my work in our library, and I come home, either go to work or cook dinner and go to bed.

THE COURT: Okay. So you have another job somewhere?

MS. LEIDEL: Essentially, yeah. I mean, sometimes --

THE COURT: Well, it's not essentially.

MS. LEIDEL: Well, it is. I mean, I don't work every day.

THE COURT: It's not like essentially yes. Do you have another job? Yes or no.

MS. LEIDEL: Yes. Yes.

THE COURT: Okay. And what are the hours for that job?

MS. LEIDEL: 4 to 9 sometimes.

THE COURT: Okay. And what do you do?

MS. LEIDEL: A waitress.

THE COURT:  Okay.  So what time do you usually during the school day, week, when do you leave your house?

MS. LEIDEL:  It depends.  5:00 a.m. or 7:00 a.m.

THE COURT:  Okay.  And then usually, whether you have to work or not work your other job, what time do you get home?

MS. LEIDEL:  If I don't work, 2:00 p.m.  If I do, I'll be home from 2 to 4 and then I go to work from 4 to 9.

THE COURT:  Okay.  And does anybody else live with you?

MS. LEIDEL:  Yes, sir.

THE COURT:  Who else lives with you?

MS. LEIDEL:  My boyfriend does.

THE COURT:  Okay.  And what does he do?

MS. LEIDEL:  He is a financial consultant.

THE COURT:  And does he work Monday through Friday?

MS. LEIDEL:  No, sir.  He works Monday through Thursday, 8 a.m. to 6:30.  He can run late.

THE COURT:  So he doesn't work on Fridays?

MS. LEIDEL:  No, sir.

THE COURT:  Okay.  All right.  Anything else you want to tell me?

MS. LEIDEL:  No.

THE COURT:  Counsel, do you want to ask her any questions while she's standing there?

MS. SMITH:  No, Your Honor.

THE COURT:  All right.  Thank you, ma'am.  Thank you, ma'am.  All right.  Go ahead, Ms. Smith.

MS. SMITH:  Your Honor, we would submit that with the correct -- with the correct restrictions on Mr. Leidel that release to the third-party custodian Cassandra Leidel would be appropriate.  Again --

THE COURT:  How many brothers and sisters does Mr. Leidel have?

MS. SMITH:  He has one sister.

THE COURT:  And that's her?

MS. SMITH:  That is her.

THE COURT:  Okay.  And is he the oldest?  Is he older than her I would assume?

MS. SMITH:  Yes, Your Honor.

THE COURT:  All right.  Anything else?

MS. SMITH:  No, Your Honor.

THE COURT:  All right.  Officer Ferguson, anything that you want to say before I hear from Mr. Cunningham?

MS. FERGUSON:  Yes, Your Honor.  Just that we agree with the Government's position on continued detention.  Based on -- I spoke with Ms. Cassandra Leidel.  You know, in theory, I would deem her a suitable third-party custodian, but in this particular case I don't think she would be just based on the amount of hours that she is out of the house, her boyfriend also has an iPhone -- or a Smartphone and a laptop device, and

she did mention to me that he has two daughters who sometimes stay over as well.  I believe one is 17, and one is 12, so I imagine they have Internet-capable devices and will be sort of coming and going.

Based on the alleged violations, you know, the fact that he was previously found allegedly in possession of a Smart device and the issues with the prior third-party custodians which, as you stated, Judge Xinis set him on pretty much the most stringent conditions he can be released on, home confinement with location monitoring, two third-party custodians that were his parents that I assume were home more often than his sister and the boyfriend will be.

You know, the sister didn't [sic] mention that she is often out of the house, as she stated, between sometimes 10 to 14 hours a day so, you know, again, based on the alleged violations and his conduct, the previously set conditions, it is Pretrial Service's position that there is no condition or set of conditions that will mitigate the risk of, you know, Mr. Leidel engaging in the same criminal conduct as previously committed.

THE COURT:  Okay.  So Mr. Cunningham --

Thank you, Officer.

So Mr. Cunningham, so look, I didn't interrupt you like I interrupted Ms. Smith, but so you have a lot of smoke but what's the direct proof that the Government can point me to

Detention Hearing 1/17/24

that it was Mr. Leidel that was doing this?

MR. CUNNINGHAM:  Judge, I think that in response to that, I'd have to go back and take the 80-page affidavit that was submitted in support of the original complaint, and essentially what you have here is if you look at the myriad of different incidence of communication that we obviously attribute to the defendant in this case, and I respect the fact that the defense has a right to defend against that and contend that we're wrong and the evidence simply doesn't meet the burden that the Government has, but --

THE COURT:  Well, it's been more than a month and you haven't charged, you haven't filed a complaint or done anything about it, right?

MR. CUNNINGHAM:  I have not superseded, Your Honor, for reasons that I would submit bear more on other constraints rather than any assessment as to whether the evidence is there or not.

THE COURT:  Right.

MR. CUNNINGHAM:  I would note that it was the end of the year, the holiday season, I would just represent to you --

THE COURT:  Right.  I understand.

MR. CUNNINGHAM:  -- there were other time constraints.

THE COURT:  I mean, my point is, as we stand here, as we sit -- you stand, I sit -- today, he hasn't been charged

with any of this conduct.

MR. CUNNINGHAM:  No.  He has not, Your Honor.

THE COURT:  Okay.

MR. CUNNINGHAM:  And obviously, you know, the charging decision, the Government before we charge somebody has got to be satisfied with proof beyond a reasonable doubt in our own assessment.  I realize a grand jury standard is probable cause.  That's the standard here, probable cause and/or clear and convincing evidence.

And I would submit to you that it's essentially the amalgam of information in this case, and when you look at the variety of different ways in which the defendant undertook to perpetrate the initial stalking offense against ES, some of which, you know, independent of the questions surrounding, you know, obfuscated e-mail communications or obfuscated text communications, how do you get behind the Emkei fake e-mailer.

Well, things that we looked at were the association of the communication -- one, who the communications were directed to. They were all directed in ways that were clearly intended, if in not in fact having the immediately great emotional impact on ES in this case, communications that alleged rather, you know, odious things on her part, a fake communication that purported to be from her to a purported paramour, you know, claiming that she had to hang out in an abortion clinic with a bunch of -- and it uses the N word.  She didn't make that communication,

but it was all part of a pattern. And again, I don't want to spend hours going through an 80-page, you know, affidavit that essentially tied this back to him.

But the one thing, one of the clear things that essentially showed to the Government the defendant's motive in this case was a document that was generated by the defendant on his USUHS secure access. It was a fake medical record purporting to be from ES's military medical records purporting to show a consultation with a psychiatrist, two psychiatrists at Wright-Patterson Air Force Base in Ohio where the defendant and his then-wife ES had been -- had been stationed back when he was on active duty in the Air Force.

The agents interviewed both of the psychiatrists. Neither one of them created that medical record. It was created at USUHS in this secure system. It was created by and provided to a professional who had been assigned by the Court system in Virginia to assess the parents' relative capacity for child custody.

That person, in turn, was trying to assess the reliability of it, it came to the Government's attention, the Government then tracked it down and proved that it was a made-up document. The defendant created it and e-mailed it to himself from the USUHS system and, you know, from that, it was the Government essentially -- essentially proved to our own satisfaction that the defendant's motive to engage in this conduct --

THE COURT:  And all this wasn't while he was under conditions of release.

MR. CUNNINGHAM:  No, that was -- that's part of the charged conduct, Judge.

THE COURT:  Okay.

MR. CUNNINGHAM:  What I'm suggesting to you is, you know, that was -- was -- you know, very clear cut.  The rest of this stuff, you have to put it together with, you know, tracking Internet Protocols, figuring out, you know, we tracked one Internet Protocol to a friend.  In fact, it was the friend who originally the defendant had proposed as a third-party custodian, and we discovered that he visited that friend, he had access to that friend's Internet while he was there and some of the communications in the under -- underlying charged communications came from that Internet Protocol address.

Now, as I started out, I understand in the context of Domestic Relations there's anger and hostility on both sides.  We're not blinded to that fact, but I will represent that at least as to the underlying charges, the Government did endeavor to make sure that these did not resolve back to the -- ES and that there was, you know, some way in fact that we were being hoodwinked by the other party as to the Domestic Relations.

As to the more specific, the bases for the --

THE COURT:  Before that, let me ask you one question.  What about Ms. Smith, she raised an interesting point, she

didn't really expound on it, but that the time frame from all these allegations that you're using as a basis to revoke were like January, February into March, right after he got put on conditions of release. So putting aside violation or not, there's been April, May, June, July, August, September, October, November into December, so nine months, rough more or less, of no problems with his supervision.

Do you agree with that? I don't have any information that there is any.

MR. CUNNINGHAM: Well, you said putting aside. I mean, obviously, Judge, we were trying to be accommodating with respect to travel. We discovered that at least in October there was some conduct that was in violation of the limited travel authorization, so I'm not prepared to say that there weren't other instances. I don't --

THE COURT: I mean, look, I don't really think it's that big of a deal. I mean, again, I don't know exactly what the Judge told the defendant, but if you have permission to go down to Norfolk to deal with your court case and your domestic thing and you go by your kid's school to say hi, yeah, that may not be technically correct, but you're not being revoked for that. Go ahead.

MR. CUNNINGHAM: Judge, may I have one moment to consult with counsel?

THE COURT: Sure. Yeah.

(Pause in Proceedings.)

MR. CUNNINGHAM:  Well, Judge, I don't agree that that was a minor deviation.

THE COURT:  Okay.

MR. CUNNINGHAM:  I think given the very strict restrictions that were imposed that was incumbent on Mr. Leidel to make sure that anything he wanted to do was approved by the Court, and this was a deviation that was simply not acceptable.

The -- I mean, I would simply --

THE COURT:  I never saw a violation.  Pretrial, did you write an NOV on that?

MS. FERGUSON:  No, Your Honor.  He was being supervised by Officer Jeff Daniel in the Middle District of Pennsylvania.  I had spoken with him prior to receiving word of the revocation filed by the Government and he stated he was made aware of the unauthorized stop.  That was the only, you know, noncompliance he was aware of between the period you're referring to.  There was no other noncompliance or violations reported to me.

THE COURT:  Okay.  Thank you.  Go ahead, Mr. Cunningham.

MR. CUNNINGHAM:  Judge, I would simply say in response to one of your first questions of the representation, in fact, the Government did find that in the room that apparently Mr. Leidel occupied when he was in his parents'

residence they found a Playstation and it was a device that was Internet capable. You know, whether it at some point in time had been connected to the Internet, we don't have the forensics on that.

Additionally, I mean, I represented the fact that HL gave sort of ambiguous accounts of his phone but he did acknowledge that there were times when he left his phone at the residence when Mr. Leidel would have had access to it. And I concur with the Court's conclusion that either he was in direct collusion with the defendant or the defendant had learned his password in some way and was using that phone.

THE COURT: So Ms. Smith, do you dispute that an Internet-capable Playstation was in your client's bedroom in the house in Scranton at the time of the search?

MS. SMITH: Your Honor, I do not. My understanding, and again, when we were setting the conditions of release initially, my understanding was that it was Internet-capable devices, that removing all WiFi and making sure that none of the devices were actually connected to the Internet. My understanding is that, like, that PS5 has never been connected to the Internet, so that is my understanding.

Your Honor, if I can just provide one brief clarification --

THE COURT: But doesn't the -- doesn't the box (v) say no use of computer systems, Internet-capable devices,

and/or similar electronic devices at any location, and then third-party custodian -- and (w) says third-party custodians must swear in a notarized affidavit, which I haven't seen, that they removed all Internet-capable devices and will not facilitate any new devices, that they will keep their cell phones on their person at all times, password protect their cell phones, and restrict the defendant from using their cell phone.

So that's the conditions of release by Judge Xinis. So why isn't it just a simple case that he had a PS capable -- Internet-capable device in his bedroom which violates these conditions, game over? No pun intended. It's a good pun, but no pun intended. Go ahead.

MS. SMITH: Your Honor, I think even if that is clear and convincing evidence, he -- this was violated. Your Honor, Pretrial was at the house. Pretrial, my understanding is that they came and did a sweep of the house to make sure everything was okay. Again, my understanding -- my understanding is that these weren't connected and, again, I think with the third --

THE COURT: But that's not the -- the conditions of -- you keep coming back to that, and I get it, but it's just not Internet-connected. It's Internet-capable, right? Capable. Capable. Internet-capable. Try to say that five times real fast.

MS. SMITH: Your Honor, I do understand that, and I

apologize, I'm pulling up the affidavits, if you can give me one moment.

THE COURT:  I mean, look, here's the problem -- and you can look it up -- knowing Judge Xinis like I do, I mean, she put him on the strictest conditions to keep him out of pretrial custody, and I think probably reading this and reading between the lines, she wanted to make him live in a house that was like Beaver Cleaver's, okay, like 1950s house in Scranton and with no ability to use the Internet, to do anything legal or perhaps illegal.

And that is not what has happened here, and it is -- I find that there have been communications generated from that house in Scranton on Internet-capable devices that lead me to conclude either that dad did it on his own or that the defendant did it either with the assistance of the dad or without the dad's knowledge.

How old is the dad, by the way, just out of curiosity?

MS. SMITH:  62.

THE COURT:  So you know, I'm trying to figure out how I can fashion release conditions where Judge Xinis has already fashioned the most restrictive Internet-related conditions of release that have proven to be violated, for the lack of better -- lack of a better word.

So I don't know why you think letting him live with his sister who's never home and a boyfriend who's not here today

who I don't even know if he's willing to allow Mr. Leidel to live 24/7 in his apartment, especially if he's got teenage children who want to come over, and I don't know why that's going to be any better than living with his parents which has turned out to be not too successful.

MS. SMITH:  Your Honor, and again, with the -- going back to the PS5, I believe his parents believed that was within the -- like that was allowable within the conditions.

THE COURT:  That was what?

MS. SMITH:  That that was allowable within the conditions.  I don't believe that there was an intent to break the conditions of release.

Your Honor, we can tighten the restrictions and say like, you know, you can't have -- like no Internet-capable devices can be in the house except for your phones that have to have like two-step verification on them.  We have no -- no problem doing that.

THE COURT:  But how can you say that because you have no idea whether the boyfriend, the Scranton financial advisor, will ever agree to not bring his laptop into his own apartment or that the sister who is going to school and works full-time, very law-abiding, working hard, that somehow she's going to leave her laptop and her iPhone in the -- in the trunk of her car and not bring it into the apartment, which is going to be very difficult for Pretrial to supervise anyways, right?

MS. SMITH:  And Your Honor, we would not oppose staying the release and giving an opportunity for them to swear affidavits to something to that effect.

THE COURT:  Yeah, the affidavit thing, where is the -- is there a notarized affidavit somewhere from the third-party custodians?  Has anybody ever seen, because that was one of the conditions, swear in a notarized affidavit.  I don't know.

Pretrial Officer Ferguson, have you ever seen a notarized affidavit?

MS. FERGUSON:  I apologize, Your Honor, I have not. It may be that it was provided to Officer Daniel in the Middle District of Pennsylvania.  I have not been provided with a copy of that.

THE COURT:  Ms. Smith, Mr. Proctor, did you guys write up a notarized affidavit for the parents?

MR. PROCTOR:  I remember filing one.  Give me one second.  I'll find it.

MS. SMITH:  Your Honor, it was a condition, again, the release was stayed pending the signing of those affidavits --

THE COURT:  Okay.

MS. SMITH:  -- with Judge Xinis.

THE COURT:  All right.

MR. PROCTOR:  I'm looking at them now, Your Honor,

but I'm looking at them as signed.  I don't know the ECF number.  They were signed on the 4th of January 2023.  I'm happy to read it into the record, if that would make it easier.

THE COURT:  No, I believe you.  No, that's fine.  Okay.  All right.  Anything else by anybody?

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  Ms. Smith, anything else?

MS. SMITH:  No, Your Honor.

THE COURT:  All right.  So this matter is before the Court for a hearing on whether or not release conditions are appropriate for Mr. Leidel in this case.  Mr. Leidel was initially put on conditions of release on January 3rd, 2023, by Judge Xinis in an order setting conditions of release.

We have talked about and don't need to belabor the pertinent parts which brings us here today which was that the District Judge ordered no use of computer systems, Internet-capable devices and/or similar electronic devices at any location, and the defendant shall cooperate, and also that the third-party custodians must swear in a notarized affidavit, which I accept of course Mr. Proctor's representation that that has been done and docketed, but they removed all Internet-capable devices and will not facilitate any new devices, that they will keep their cell phones on their person at all times, protect -- password protect their cell phones and restrict the defendant from using their cell phones.

And these two conditions set by Judge Xinis have come into conflict with the affidavit that the Government filed which resulted in the arrest warrant for Mr. Leidel, as well as the Government's proffer today about the e-mails and text messages that began in January of '23 and went into March of 2023, that -- that, again, eerily has the DNA of the same subject matter of the underlying substantive charges of Mr. Leidel in this case.

So the question today is, you know, really two.  One is, under 3148, you know, can I make a finding that -- kind of turn it backwards, that he would abide by any conditions that I impose, assuming that I can figure out an even more restrictive computer, Internet connectivity, Internet-capable condition than the one that Judge Xinis already -- already fashioned, and is he unlikely to abide by that because he has wicked Internet and -- not Internet, but wicked skills, and not in a bad sense but good skills that he knows how to manipulate and use technology to further whatever means he wants, which has already been found by the grand jury, at least in probable cause for the underlying charges in this case.

I do find, I mean, that the third-party custodian's not suitable.  I concur with Officer Ferguson.  I trust Officer Ferguson implicitly in her judgment and her professional abilities and we've been down the road a lot and I instinctively trust her.

And you know, I know the sister wants to help her brother. I get it.  But the sister has a very busy life of her own, and I am not willing to let Mr. Leidel hang around an apartment unmonitored by anyone for any period of time, and I'm also very troubled by the fact that, you know, the boyfriend, I have no idea where the boyfriend is and, you know, I have no idea whether he's willing to allow his circumstance to occur where Mr. Leidel's literally locked in 24/7 and there are no, no, no Internet-capable devices permitted in the residence period, because password protected didn't work.  It didn't work with the parents, and I'm not sure it would work with the sister.

And you know, this is a problem when you have family members, this is why I don't allow husbands to be third-party custodians for wives or wives to be third-party custodians for husbands or girlfriends or boyfriends because they're the worst.  They're the worst.  They love the person and are capable of looking the other way because they love the person and they are not the eyes and ears of the Court and they make terrible third-party custodians.

So I -- first of all, I find that detention's appropriate in this case.  I also find that there is no third-party custodian that has been presented today that I would have confidence in to be the eyes and ears of the Court if I was inclined to try to figure out a way to even make these conditions of release more stringent.

I totally get Ms. Smith's argument and she has -- there is merit to her argument, but it only -- merit only goes too far because we're not in like proof beyond a reasonable doubt world here and that's not the world that I live in right here right now.

And, you know, the question is something happened there in Scranton, and I have no faith in the third-party custodians remaining as third-party custodians, the parents, and by -- by extension, I have no faith, despite her coming down here and taking time from her busy schedule, going to school, work, and doing all the things to get by, to come down to show her love and support for her brother, that's not going to work.

So Mr. Leidel's detained and remanded to the custody of the Marshal.  I'll do an order of detention.  Anything else?

MR. CUNNINGHAM:  No, Your Honor.

THE CLERK:  All rise.  This Honorable Court stands in recess.

(The proceedings concluded at 11:52 a.m.)

CERTIFICATE OF OFFICIAL REPORTER
    I, Amanda L. Longmore, Registered Professional Reporter and Federal Certified Realtime Reporter, do hereby certify that the foregoing is a correct transcript of the audio-recorded proceedings in the above-entitled matter, audio recorded via FTR Gold on January 17, 2024, and transcribed from the audio recording to the best of my ability and that said transcript has been compared with the audio recording.

Dated this 27th day of July 2024
-S-
_____
AMANDA L. LONGMORE, RPR, FCRR
FEDERAL OFFICIAL COURT REPORTER

'23 [1] - 43:5
10 [2] - 23:17; 30:14
100 [1] - 17:4
10:42 [1] - 2:2
11:52 [1] - 45:18
12 [1] - 30:2
13 [3] - 17:2; 22:8
13s [1] - 17:5
14 [1] - 30:15
17 [2] - 30:2; 45:21
17th [1] - 6:5
1950s [1] - 39:8
19th [1] - 24:6
2 [1] - 28:7
2022 [5] - 3:8; 6:16; 7:17; 9:7; 17:4
2023 [14] - 3:7; 4:17; 6:5; 8:19; 10:3; 11:12; 14:9; 23:14; 24:5-7; 42:2, 12; 43:5
2024 [2] - 45:21, 23
22-cr-0380 [1] - 2:10
24/7 [2] - 40:2; 44:8
24th [1] - 23:14
27th [1] - 45:23
2:00 [1] - 28:6
3148 [2] - 24:22; 43:10
3rd [2] - 24:5; 42:12
4 [3] - 27:23; 28:7
40 [1] - 3:14
4136 [2] - 8:7
4th [1] - 42:2
5 [1] - 17:23
5:00 [1] - 28:3
62 [1] - 39:18
6:30 [1] - 28:17
7 [1] - 14:9
7:00 [1] - 28:3
7th [1] - 2:21
8 [1] - 28:17
80-page [2] - 31:3; 33:2
9 [2] - 27:23; 28:7
9th [1] - 6:6
a.m [5] - 2:2; 28:3, 17; 45:18
abide [3] - 24:20; 43:11, 15
abiding [1] -

40:22
abilities [1] - 43:24
ability [2] - 39:9; 45:22
able [1] - 8:3
abortion [1] - 32:24
above-entitled [1] - 45:21
absolutely [1] - 26:6
accept [1] - 42:20
acceptable [1] - 36:8
accepted [1] - 20:3
accepting [1] - 19:18
access [11] - 3:15, 18; 4:7; 11:25, 14:6; 18:25; 19:1; 26:22; 33:7; 34:13; 37:8
accessed [1] - 19:2
accommodating [2] - 11:9; 35:11
according [1] - 9:11
account [7] - 8:4, 20; 9:19; 10:19; 12:8; 18:19; 23:14
accounts [4] - 12:6; 18:18, 21; 37:6
accurate [1] - 10:19
acknowledge [2] - 4:14; 37:6
acknowledged [1] - 13:21
active [2] - 8:19; 33:12
actual [1] - 10:18
ad [2] - 5:11; 6:9
add [1] - 14:20
addition [1] - 4:6
additionally [1] - 37:5
address [9] - 6:3, 24-25; 22:11; 23:6, 9; 34:15
addresses [2] - 12:6; 20:25
advisor [1] - 40:19
affidavit [19] -

3:20; 4:9, 15; 6:19, 23; 8:11; 10:2, 4; 11:7; 31:3; 33:2; 38:3; 41:4, 7, 10, 16; 42:19; 43:2
affidavits [3] - 39:1; 41:3, 21
afforded [3] - 3:18; 4:11; 12:14
age [1] - 13:8
Agent [6] - 2:11; 6:20; 14:17, 20; 15:13; 22:1
agent [11] - 6:21; 7:13; 17:1; 21:13, 16-17, 24; 22:4, 14, 16
Agent's [1] - 4:12
agents [9] - 5:9; 8:14; 10:9; 13:17; 14:9, 21; 17:20; 19:24; 33:13
ago [1] - 23:17
agree [4] - 29:19; 35:8; 36:2; 40:20
ahead [7] - 15:16; 21:22; 22:3; 29:2; 35:22; 36:20; 38:13
Air [2] - 33:10, 12
allegations [2] - 16:25; 35:2
alleged [6] - 20:4, 11; 23:18; 30:5, 15; 32:21
allegedly [2] - 20:25; 30:6
allow [3] - 40:1; 44:7, 13
allowable [2] - 40:8, 10
allowed [1] - 24:16
allows [1] - 22:4
alluded [2] - 10:12; 11:6
alone [2] - 25:22, 25
amalgam [1] - 32:11
AMANDA [1] - 45:25
Amanda [1] - 45:19
ambiguous [3] - 13:4, 19; 37:6

Amos [1] - 2:12
amount [1] - 29:24
analysis [7] - 4:19; 7:24; 8:15, 21; 12:5
Android [1] - 26:3
anger [1] - 34:17
answer [1] - 26:11
anyways [1] - 40:25
apartment [4] - 40:2, 20, 24; 44:3
apologize [4] - 19:13; 21:10; 39:1; 41:11
appeared [1] - 12:8
Apple [3] - 14:22; 22:9, 15
applications [4] - 3:21; 12:22; 13:1, 15
appropriate [3] - 29:6; 42:11; 44:20
appropriately [1] - 5:22
approved [1] - 36:7
April [2] - 8:19; 35:5
area [2] - 5:7; 11:13
arguably [1] - 10:6
argument [5] - 23:2, 16-17; 45:1
arrest [4] - 7:17; 9:10, 19; 43:3
arrested [2] - 3:8; 9:7
aside [2] - 35:4, 10
aspect [1] - 11:6
aspersions [1] - 7:13
assess [2] - 33:17, 19
assessment [2] - 31:16; 32:7
assiduously [1] - 5:13
assigned [6] - 3:11; 8:20, 25; 12:7; 33:16
assistance [1] - 39:15

association [1] - 32:17
assume [3] - 2:23; 29:13; 30:11
assuming [1] - 43:12
attached [2] - 3:23; 18:3
attempt [1] - 11:4
attention [2] - 7:23; 33:20
attorney [2] - 7:4, 23
attribute [2] - 14:24; 31:7
attributes [1] - 11:3
audio [4] - 45:20
audio-recorded [1] - 45:20
August [1] - 35:5
AUSA [1] - 23:14
authority [3] - 5:16, 20; 11:13
authorization [2] - 4:10; 35:14
authorized [4] - 8:5; 11:15, 20, 22
avoid [1] - 5:17
avoiding [1] - 5:13
aware [5] - 6:16; 10:22; 16:19; 36:16
awry [1] - 15:22
backwards [1] - 43:11
bad [1] - 43:16
Base [1] - 33:10
based [4] - 29:20, 23; 30:5, 15
bases [1] - 34:23
basis [1] - 35:2
bear [1] - 31:15
beaver [1] - 39:8
bed [1] - 27:12
bedroom [2] - 37:13; 38:11
began [3] - 4:24; 24:6; 43:5
begin [1] - 15:17
behalf [1] - 2:14
behavior [3] - 4:4; 13:13
behind [1] - 32:16
belabor [1] - 42:14
believes [1] - 14:4
best [3] - 5:17;

17:4; 45:22
best-selling [1] - 17:4
better [3] - 39:23; 40:4
between [4] - 22:16; 30:14; 36:17; 39:7
beyond [3] - 5:15; 32:6; 45:3
big [1] - 35:17
blame [1] - 20:19
blatantly [1] - 18:20
bled [1] - 24:7
blind [1] - 24:16
blinded [1] - 34:18
bold [1] - 11:23
bold-faced [1] - 11:23
box [1] - 37:24
boyfriend [7] - 28:12; 29:24; 30:12; 39:25; 40:19; 44:5
boyfriends [1] - 44:15
Brady [1] - 11:1
break [1] - 40:11
Brian [3] - 8:11, 13
brief [1] - 37:22
briefly [1] - 4:13
bring [2] - 40:20, 24
brings [1] - 42:15
brother [2] - 44:1; 45:12
brothers [1] - 29:7
brought [1] - 15:6
browser [2] - 22:6, 8
bunch [1] - 32:24
burden [1] - 31:10
busy [2] - 44:2; 45:10
capable [39] - 3:17; 7:10; 8:17; 12:1, 15-16, 23; 13:24; 14:6; 17:12, 17; 18:1, 8; 24:21; 26:4, 22; 30:3; 37:2, 13, 17, 25; 38:4, 10-11, 22-23; 39:13; 40:14; 42:17, 22; 43:13; 44:9, 17

Detention Hearing 1/17/24

**capacity** [1] - 33:17
**car** [1] - 40:24
**case** [25] - 2:7, 9, 24; 3:11; 6:21; 7:6, 13; 11:4; 14:25; 18:21; 20:5, 19; 24:25; 29:23; 31:7; 32:11, 21; 33:6; 35:19; 38:10; 42:11; 43:8, 20; 44:21
**Cassandra** [5] - 25:7; 26:18, 20; 29:5, 21
**cast** [2] - 22:20; 24:24
**casting** [1] - 7:13
**caused** [1] - 10:17
**Celine** [1] - 2:18
**cell** [7] - 18:13; 38:5, 7; 42:23
**certain** [6] - 5:18; 6:14; 12:6, 25; 17:2; 20:25
**certainly** [4] - 9:21; 10:19, 22; 15:6
**CERTIFICATE** [1] - 45:19
**Certified** [1] - 45:20
**certify** [1] - 45:20
**change** [1] - 13:10
**changed** [1] - 13:6
**changing** [1] - 13:11
**character** [1] - 10:16
**characters** [2] - 22:20; 24:24
**charge** [2] - 7:21; 32:5
**charged** [7] - 3:8; 7:16, 19; 31:12, 25; 34:4, 14
**charges** [9] - 7:6; 8:2; 10:7, 14; 11:2; 15:6; 34:19; 43:7, 20
**charging** [1] - 32:5
**checks** [1] - 13:23
**child** [2] - 11:10; 33:17
**children** [6] - 5:8, 11; 6:10; 11:18;

20:12; 40:3
**circumstance** [1] - 44:7
**circumstances** [1] - 11:21
**claimed** [1] - 9:13
**claiming** [1] - 32:23
**clarification** [1] - 37:23
**class** [1] - 27:8
**clear** [10] - 4:6, 21; 6:12; 9:21; 15:2; 24:11; 32:8; 33:4; 34:7; 38:14
**clearly** [5] - 5:15; 7:8; 10:16; 13:18; 32:19
**cleaver's** [1] - 39:8
**CLERK** [2] - 2:3; 45:16
**clerk** [2] - 25:17
**client** [7] - 15:21; 22:24; 25:3, 22, 25
**client's** [3] - 22:24; 24:22; 37:13
**clinic** [1] - 32:24
**clinical** [1] - 27:10
**cohabitated** [1] - 7:18
**collected** [1] - 19:16
**collusion** [2] - 14:5; 37:9
**Columbia** [2] - 23:7, 10
**coming** [8] - 16:22; 17:8; 20:25; 21:3; 22:21; 30:4; 38:21; 45:9
**committed** [2] - 4:3; 30:20
**common** [1] - 20:12
**communicate** [1] - 9:25
**communicated** [1] - 6:12
**communication** [13] - 5:19; 6:25; 7:7, 22; 9:23; 11:3; 14:11; 18:13; 19:4; 31:6; 32:18, 22, 25

**communications** [19] - 8:17, 21-22, 24-25; 9:16, 20; 10:14, 23; 13:2; 14:24; 21:5; 32:15, 18, 21; 34:14; 39:12
**community** [1] - 24:4
**compared** [1] - 45:22
**complaint** [6] - 3:9; 7:16, 19; 21:15; 31:4, 12
**complicity** [1] - 14:15
**complying** [1] - 24:22
**computer** [6] - 24:12, 20; 26:9; 37:25; 42:16; 43:13
**conclude** [1] - 39:14
**concluded** [1] - 45:18
**conclusion** [1] - 37:9
**concur** [2] - 37:8; 43:22
**condition** [3] - 30:17; 41:19; 43:13
**conditions** [34] - 3:13, 15, 24; 4:7; 11:24; 12:13, 15; 14:1; 15:3; 24:4, 8, 23; 30:9, 16, 18; 34:2; 35:4; 37:16; 38:9, 12, 20; 39:5, 20-21; 40:8, 11-12; 41:7; 42:10, 12-13; 43:1, 11; 44:25
**conduct** [14] - 6:22; 7:20; 10:20; 12:11; 14:15; 15:5; 22:21; 24:6; 30:16, 19; 32:1; 33:25; 34:4; 35:13
**confidence** [1] - 44:23
**confinement** [1] - 30:10
**confirm** [2] - 8:3; 12:16

**confirmed** [1] - 8:18
**confirms** [1] - 9:2
**conflict** [1] - 43:2
**confronted** [1] - 13:17
**connect** [1] - 21:14
**connected** [10] - 17:15, 17, 21-23; 37:3, 19-20; 38:19, 22
**connecting** [1] - 18:1
**connection** [1] - 22:15
**connectivity** [4] - 18:8; 26:4, 10; 43:13
**connects** [2] - 27:2, 4
**consciousness** [1] - 14:14
**consented** [3] - 2:22; 5:21; 11:14
**consideration** [1] - 15:7
**conspiracy** [1] - 22:23
**constitute** [1] - 10:21
**constraints** [3] - 11:21; 31:15, 23
**consult** [2] - 14:16; 35:24
**consultant** [1] - 28:14
**consultation** [1] - 33:9
**contact** [3] - 4:8; 19:10
**contained** [3] - 4:15; 7:8; 14:15
**contempt** [1] - 25:10
**contend** [2] - 23:25; 31:8
**content** [2] - 10:4, 18
**contention** [4] - 3:24; 19:18; 20:2; 22:14
**contentions** [1] - 13:4
**context** [5] - 5:12, 18; 7:12; 13:1; 34:16
**continued** [2] - 4:4; 29:20

**convenient** [1] - 13:10
**convincing** [6] - 4:6, 22; 9:22; 15:2; 32:9; 38:15
**cook** [1] - 27:11
**cooperate** [1] - 42:18
**copy** [1] - 41:13
**corner** [1] - 25:12
**correct** [12] - 2:25; 20:1, 9; 22:13; 25:21, 23; 26:1, 25; 29:4; 35:21; 45:20
**correctly** [1] - 19:24
**counsel** [10] - 2:11; 3:10; 5:11; 9:14, 17; 11:12; 14:17; 28:23; 35:24
**counseled** [1] - 5:9
**countenanced** [1] - 10:20
**couple** [1] - 15:14
**course** [2] - 11:17; 42:20
**Court** [6] - 2:4; 33:16; 36:8; 42:10; 44:23; 45:16
**court** [3] - 25:10; 35:19; 44:18
**COURT** [102] - 2:6, 16, 20; 3:1, 5; 14:18; 15:10, 16, 19, 25; 16:3, 6, 8, 14, 20; 17:6, 11, 16; 18:4, 8; 19:23; 20:4, 7, 13, 17; 21:1, 6, 8, 18, 24; 22:2, 10, 18; 23:11, 15; 24:2, 11; 25:8, 11, 19, 22, 24; 26:3, 6, 8, 13, 15, 19, 21, 24; 27:2, 4, 7, 13, 15, 18, 21, 24; 28:1, 4, 8, 11, 13, 15, 18, 20, 23; 29:1, 7, 10, 12, 15, 17; 30:21; 31:11, 18, 21, 24; 32:3; 34:1,

5, 24; 35:16, 25; 36:4, 10, 20; 37:12, 24; 38:20; 39:3, 19; 40:9, 18; 41:4, 15, 22, 24; 42:4, 7, 9; 45:25
**Court's** [1] - 37:9
**courtroom** [1] - 23:20
**create** [1] - 7:6
**created** [4] - 33:14, 22
**creates** [1] - 13:11
**credibility** [2] - 10:6, 8
**crimes** [1] - 4:3
**Criminal** [1] - 2:10
**criminal** [2] - 15:5; 30:19
**cryptic** [1] - 8:10
**CUNNINGHAM** [22] - 2:8, 25; 3:3, 6; 14:20; 21:5, 7; 31:2, 14, 19, 22; 32:2, 4; 34:3, 6; 35:10, 23; 36:2, 5, 22; 42:6; 45:15
**Cunningham** [10] - 2:10; 16:15; 19:24; 21:2; 22:19; 23:14; 29:18; 30:21, 23; 36:21
**curiosity** [1] - 39:17
**current** [1] - 22:8
**custodian** [11] - 12:14; 13:14; 15:23; 23:24; 24:19; 25:6; 29:5, 22; 34:12; 38:2; 44:22
**custodian's** [1] - 43:21
**custodians** [13] - 9:12; 12:5; 14:3; 30:7, 11; 38:2; 41:6; 42:19; 44:14, 19; 45:7
**custody** [10] - 3:12, 19; 6:10, 15; 11:11; 12:21; 13:6; 33:18; 39:6; 45:13
**cut** [1] - 34:7
**Czech** [1] - 21:20

**Czechoslovakia** [1] - 8:1
**dad** [12] - 16:15; 22:24; 24:14, 17; 25:3, 11, 19; 39:14, 17
**dad's** [1] - 39:16
**daily** [1] - 27:8
**Daniel** [2] - 36:13; 41:12
**data** [3] - 4:18; 23:5, 8
**Dated** [1] - 45:23
**daughters** [1] - 30:1
**deal** [2] - 35:17, 19
**December** [6] - 2:21; 3:22; 4:23; 12:3; 14:9; 35:6
**deceptive** [1] - 10:23
**decision** [1] - 32:5
**deem** [1] - 29:22
**deep** [1] - 18:21
**defeat** [1] - 10:6
**defend** [1] - 31:8
**defendant** [23] - 3:2; 10:13; 11:4, 10, 18; 13:22; 14:6, 24; 20:5, 19; 31:7; 32:12; 33:6, 10, 22; 34:11; 35:18; 37:10; 38:7; 39:15; 42:18, 25
**defendant's** [3] - 10:3; 33:5, 25
**defense** [2] - 10:25; 31:8
**deleted** [1] - 13:20
**denied** [2] - 13:14, 17
**denies** [1] - 10:9
**despite** [2] - 24:18; 45:9
**detail** [2] - 6:18
**detained** [2] - 3:9; 45:13
**detention** [5] - 2:12, 22, 24; 29:20; 45:14
**detention's** [1] - 44:20
**determined** [1] - 6:2
**deviation** [2] - 36:3, 8

**device** [10] - 9:23; 12:6, 15; 13:24; 14:7; 22:17; 29:25; 30:7; 37:1; 38:11
**devices** [30] - 3:17; 8:18; 12:1, 16, 23; 17:12, 15, 18, 25; 18:2, 23; 19:20; 24:16, 21; 26:22; 30:3; 37:18, 25; 38:1, 4-5; 39:13; 40:14; 42:17, 22-23; 44:9
**different** [2] - 31:6; 32:12
**difficult** [1] - 40:25
**dinner** [1] - 27:11
**direct** [3] - 22:15; 30:25; 37:9
**directed** [2] - 32:18
**directly** [1] - 16:2
**disagree** [1] - 24:8
**discovered** [8] - 8:14; 10:25; 11:17; 12:18, 22; 14:9; 34:12; 35:12
**discovery** [2] - 18:22; 19:15
**dispute** [3] - 17:11, 14; 37:12
**distress** [1] - 10:17
**District** [6] - 2:3; 3:22; 36:13; 41:13; 42:16
**DNA** [1] - 43:6
**Docket** [1] - 2:10
**docketed** [1] - 42:21
**document** [2] - 33:6, 21
**Document** [1] - 3:14
**domestic** [3] - 5:5, 14; 35:19
**Domestic** [2] - 34:17, 22
**done** [2] - 31:12; 42:21
**doubt** [2] - 32:6; 45:3
**down** [6] - 5:5; 33:21; 35:19;

43:24; 45:9, 11
**downloaded** [2] - 12:23; 13:16
**DuckDuckGo** [3] - 12:24; 17:2; 22:8
**duly** [1] - 26:18
**during** [2] - 25:19; 28:1
**duty** [1] - 33:12
**e-mail** [22] - 6:7, 19; 7:2, 11, 15; 8:4; 10:2, 4-5, 10, 18; 12:8; 18:18; 19:15; 20:25; 23:4, 6, 13-14; 32:15
**e-mailed** [1] - 33:22
**e-mailer** [3] - 7:25; 10:11; 32:16
**e-mails** [5] - 18:19; 20:18; 23:4, 11; 43:4
**early** [4] - 3:11, 22; 11:12; 12:3
**ears** [2] - 44:18, 23
**easier** [1] - 42:3
**ECF** [1] - 42:1
**eerily** [1] - 43:6
**effect** [1] - 41:3
**either** [10] - 4:3; 22:24; 24:15, 22; 25:1, 3; 27:11; 37:9; 39:14
**electronic** [2] - 38:1; 42:17
**electronically** [1] - 6:13
**Emkei** [8] - 7:25; 8:1; 10:11; 18:18, 21, 23; 32:16
**emotional** [2] - 10:17; 32:20
**employed** [1] - 10:13
**enable** [1] - 4:20
**enabling** [1] - 14:6
**end** [3] - 15:18; 19:22; 31:19
**endeavor** [1] - 34:19
**ended** [1] - 8:7
**engage** [2] - 11:10; 33:25

**engaged** [5] - 3:25; 6:3; 10:23; 12:11; 15:5
**engaging** [2] - 7:20; 30:19
**ensued** [1] - 7:14
**ensure** [1] - 3:17
**entitled** [1] - 45:21
**entry** [1] - 3:14
**errors** [2] - 7:8
**ES** [15] - 5:25; 6:2; 7:1; 10:2, 6, 9, 15-16, 23; 19:13; 20:18; 32:13, 21; 33:11; 34:20
**ES's** [3] - 8:4; 23:13; 33:8
**especially** [2] - 11:21; 40:2
**essentially** [20] - 4:18; 6:3; 8:9, 16; 9:3, 17; 10:16; 11:23; 14:14; 15:1; 22:4; 27:14, 18; 31:5; 32:10; 33:3, 5, 24
**evidence** [14] - 4:6, 22; 9:22; 13:18; 14:15; 15:2; 19:2, 20; 21:1; 22:3; 31:9, 16; 32:9; 38:15
**ex** [9] - 5:3, 7, 12, 25; 8:12; 10:3; 19:14; 20:12, 19
**ex-husband** [2] - 8:12; 20:19
**ex-spouses** [1] - 20:12
**ex-wife** [6] - 5:3, 7, 12, 25; 10:3; 19:14
**exact** [1] - 6:18
**exactly** [2] - 5:6; 35:17
**examine** [1] - 11:2
**exceeded** [1] - 11:19
**except** [2] - 19:23; 40:15
**excuse** [6] - 3:20; 5:10; 7:22; 8:19; 9:1; 12:5
**executed** [4] - 12:1; 14:8; 16:9; 18:16
**expert** [1] - 23:8

**expound** [1] - 35:1
**extension** [1] - 45:9
**extent** [1] - 5:19
**eye** [1] - 24:16
**eyes** [2] - 44:18, 23
**faced** [1] - 11:23
**facilitate** [2] - 38:5; 42:22
**facility** [1] - 18:24
**fact** [19] - 6:14; 8:5, 16; 10:6; 14:4; 15:5; 19:7, 23; 23:4; 30:5; 31:7; 32:20; 34:10, 18, 21; 36:24; 37:5; 44:5
**faith** [2] - 45:7, 9
**fake** [5] - 7:25; 10:11; 32:16, 22; 33:7
**false** [3] - 6:23; 10:19, 24
**familiar** [1] - 5:4
**family** [3] - 24:20; 25:4; 44:12
**far** [1] - 45:2
**fashion** [1] - 39:20
**fashioned** [2] - 39:21; 43:14
**fast** [1] - 38:24
**father** [7] - 9:11; 12:4, 8, 11; 15:22; 16:12; 25:16
**father's** [2] - 12:23; 21:13
**FBI** [4] - 2:11; 6:1; 19:25
**FCRR** [1] - 45:25
**February** [5] - 4:17; 7:14; 8:6; 24:7; 35:3
**FEDERAL** [1] - 45:25
**Federal** [1] - 45:20
**FERGUSON** [4] - 2:18; 29:19; 36:12; 41:11
**Ferguson** [6] - 2:19; 29:17; 41:9; 43:22
**fifth** [1] - 10:1
**figure** [4] - 20:14; 39:19; 43:12;

44:24
**figuring** [1] - 34:9
**filed** [4] - 3:23; 31:12; 36:15; 43:2
**filing** [1] - 41:17
**final** [1] - 23:16
**finalized** [1] - 11:8
**finally** [2] - 10:18; 19:4
**financial** [2] - 28:14; 40:19
**fine** [1] - 42:4
**first** [10] - 3:1-3; 8:12; 16:25; 18:19; 21:11, 14; 36:23; 44:20
**five** [1] - 38:23
**FOIA** [3] - 5:25; 19:25; 21:14
**foot** [1] - 15:22
**Force** [2] - 33:10, 12
**foregoing** [1] - 45:20
**forensic** [2] - 4:19; 7:24
**forensics** [1] - 37:3
**form** [1] - 7:5
**formed** [1] - 7:20
**frame** [9] - 3:4; 4:16; 6:16; 8:6, 24; 20:19; 22:24; 35:1
**Friday** [1] - 28:15
**Fridays** [1] - 28:18
**friend** [3] - 34:10, 12
**friend's** [1] - 34:13
**front** [1] - 3:10
**FTR** [1] - 45:21
**full** [4] - 16:10, 18; 26:19; 40:21
**full-time** [1] - 40:21
**game** [1] - 38:12
**Gary** [1] - 2:14
**gathering** [1] - 4:18
**generated** [2] - 33:6; 39:12
**girlfriends** [1] - 44:15
**girls** [1] - 13:4
**given** [2] - 11:21; 36:5
**Gold** [1] - 45:21

**Government** [31] - 2:7; 3:23; 4:20; 5:12, 21; 7:24; 10:19, 22, 24; 11:2, 9, 14, 17; 12:1, 18, 22; 14:4; 18:20; 19:12, 18; 30:25; 31:10; 32:5; 33:5, 20, 23; 34:19; 36:15, 24; 43:2
**Government's** [14] - 2:23; 3:6, 24; 4:14, 23; 7:23; 9:3, 10; 11:19; 12:10; 14:13; 29:20; 33:20; 43:4
**grammatical** [1] - 7:8
**grand** [2] - 32:7; 43:19
**great** [1] - 32:20
**guardian** [2] - 5:11; 6:9
**guess** [3] - 6:10; 15:22; 21:1
**guilt** [1] - 14:14
**guys** [1] - 41:15
**hand** [3] - 16:14, 16; 26:17
**handed** [1] - 16:12
**handing** [1] - 13:24
**hang** [2] - 32:24; 44:3
**happy** [1] - 42:3
**hard** [1] - 40:22
**header** [1] - 23:6
**hear** [1] - 29:18
**heard** [1] - 26:21
**hearing** [5] - 2:12, 23; 3:7, 10; 42:10
**held** [1] - 25:10
**help** [1] - 44:1
**hereby** [1] - 45:20
**hi** [1] - 35:20
**himself** [2] - 25:5; 33:22
**HL** [7] - 9:11; 13:3, 6, 14; 14:5, 11; 37:5
**hmm** [1] - 27:1
**holiday** [1] - 31:20
**home** [12] - 17:23; 23:23; 25:17,

22, 25; 27:10; 28:5, 7; 30:9, 11; 39:25
**honest** [2] - 21:22; 24:15
**Honor** [46] - 2:13, 19, 25; 4:13; 5:3; 14:16, 20; 15:11, 17, 24; 16:4, 18, 25; 17:3, 5; 19:12; 20:9, 21; 21:23; 23:1, 16; 25:6, 15; 26:11; 28:25; 29:3, 14, 16, 19; 31:14; 32:2; 36:12; 37:15, 22; 38:14, 25; 40:6, 13; 41:1, 11, 19, 25; 42:6, 8; 45:15
**Honorable** [2] - 2:5; 45:16
**hoodwinked** [1] - 34:22
**hostility** [1] - 34:17
**hour** [1] - 27:9
**hours** [4] - 27:21; 29:24; 30:15; 33:2
**house** [22] - 12:17; 16:3, 5-7, 10-11, 19, 21-22, 24; 23:21; 28:2; 29:24; 30:14; 37:14; 38:16; 39:7, 13; 40:15
**hub** [1] - 25:1
**husband** [2] - 8:12; 20:19
**husbands** [2] - 44:13, 15
**idea** [5] - 16:22; 21:21; 40:19; 44:6
**identification** [1] - 22:5
**identified** [1] - 21:16
**identifiers** [1] - 12:7
**identifying** [1] - 22:7
**identity** [1] - 15:12
**illegal** [1] - 39:10
**imagine** [1] - 30:3

**Imbrogno** [7] - 6:9, 13, 19; 7:3, 10; 21:15
**IMEI** [4] - 12:6; 21:3, 12; 22:11
**immediately** [2] - 8:23; 32:20
**impact** [1] - 32:20
**implicate** [1] - 6:20
**implicitly** [1] - 43:23
**import** [1] - 13:9
**impose** [1] - 43:12
**imposed** [4] - 4:10; 11:22; 12:13; 36:6
**impugned** [1] - 10:16
**impugning** [1] - 10:7
**inappropriate** [1] - 6:21
**incidence** [1] - 31:6
**incident** [3] - 10:1; 23:17
**incidents** [2] - 3:25; 7:5
**inclined** [1] - 44:24
**included** [5] - 7:16; 8:10; 10:4; 11:6; 15:3
**including** [3] - 6:14, 22; 12:24
**incumbent** [1] - 36:6
**indeed** [1] - 10:9
**independent** [1] - 32:14
**indicated** [1] - 3:20
**indicates** [2] - 17:8; 19:21
**indicative** [2] - 14:3, 13
**indictment** [2] - 3:9; 7:17
**individual** [1] - 6:8
**info** [1] - 7:22
**information** [6] - 6:22; 10:24; 11:8; 32:11; 35:8
**initial** [1] - 32:13
**initials** [1] - 5:2
**instances** [1] -

35:15
**instinctively** [1] - 43:25
**integrity** [1] - 10:8
**intelligent** [1] - 7:9
**intended** [4] - 21:20; 32:19; 38:12
**intent** [1] - 40:11
**intentionally** [2] - 7:7; 10:17
**intentions** [1] - 24:18
**interesting** [1] - 34:25
**interfere** [1] - 7:12
**Internet** [59] - 3:16; 4:8; 8:9, 17; 12:1, 6, 15-16, 23; 13:24; 14:6; 17:12, 14-15, 17, 21-22, 24; 18:1, 3, 8; 23:21; 24:21; 26:2, 4, 9, 16, 22; 27:2, 5; 30:3; 34:9, 13, 15; 37:2, 13, 17, 19, 21, 25; 38:4, 11, 22-23; 39:9, 13, 21; 40:14; 42:17, 22; 43:13, 15-16; 44:9
**Internet-capable** [25] - 3:17; 8:17; 12:1, 15-16, 23; 13:24; 14:6; 17:12, 17; 26:22; 30:3; 37:13, 17, 25; 38:4, 11, 22-23; 39:13; 40:14; 42:17, 22; 43:13; 44:9
**Internet-connected** [1] - 38:22
**Internet-related** [1] - 39:21
**interrupt** [1] - 30:23
**interrupted** [1] - 30:24
**interview** [1] - 12:4
**interviewed** [2] - 10:9; 33:13

**investigated** [1] - 6:1
**investigation** [2] - 4:18; 7:12
**investigative** [1] - 9:8
**involved** [5] - 5:5, 8; 6:10; 12:8; 24:25
**involving** [2] - 11:10; 22:20
**IP** [9] - 6:3, 24-25; 12:6; 22:11; 23:6
**iPhone** [16] - 9:6, 17-18; 16:14, 19; 17:2-4; 22:8; 26:3, 7, 23; 27:4; 29:25; 40:23
**iPhones** [4] - 18:4-6, 14
**issue** [2] - 15:12; 20:14
**issues** [1] - 30:7
**itself** [1] - 6:23
**January** [12] - 3:7, 12; 4:17; 6:5; 24:5; 35:3; 42:2, 12; 43:5; 45:21
**Jason** [2] - 2:9, 14
**Jeff** [1] - 36:13
**Jennifer** [1] - 2:13
**job** [4] - 27:13, 19, 22; 28:5
**judge** [8] - 3:3; 15:8; 31:2; 35:11, 18, 23; 36:2, 22
**Judge** [17] - 2:8; 3:11; 11:22; 13:25; 18:10; 24:2; 30:8; 34:4; 38:9; 39:4, 20; 41:23; 42:13, 16; 43:1, 14
**judge's** [1] - 11:15
**judgment** [1] - 43:23
**July** [2] - 35:5; 45:23
**Jump** [1] - 12:25
**June** [1] - 35:5
**jurisdiction** [1] - 5:6
**jury** [2] - 32:7; 43:19
**keep** [5] - 13:11; 38:5, 21; 39:5; 42:23

**Kevin** [1] - 6:20
**kid's** [1] - 35:20
**kind** [5] - 4:13; 10:13; 20:23; 21:8; 43:10
**knowing** [1] - 39:4
**knowledge** [1] - 39:16
**knows** [1] - 43:17
**Kuo** [1] - 6:20
**lack** [2] - 39:22
**laid** [1] - 6:18
**landlines** [1] - 18:12
**lap** [1] - 26:24
**laptop** [5] - 26:9, 25; 29:25; 40:20, 23
**last** [4] - 2:21; 23:4, 17
**late** [4] - 3:8; 9:7; 10:3; 28:17
**law** [1] - 40:22
**law-abiding** [1] - 40:22
**lead** [1] - 39:13
**learn** [1] - 11:1
**learned** [1] - 37:10
**least** [8] - 7:14; 8:19; 9:11; 14:5; 21:5; 34:19; 35:12; 43:19
**leave** [2] - 28:2; 40:23
**left** [3] - 14:12; 16:15; 37:7
**legal** [1] - 39:9
**Leidel** [51] - 2:9, 14, 22; 3:7, 12, 25; 5:4, 20; 6:14; 7:6, 10, 18; 8:2, 16; 9:2, 23; 10:7; 12:14, 19, 21; 13:6, 14, 24; 16:2, 21; 19:2, 5-6, 11; 20:10; 23:19; 25:16, 18; 26:18, 20; 29:4, 8, 21; 30:19; 31:1; 36:6, 25; 37:8; 40:1; 42:11; 43:3, 7; 44:3
**LEIDEL** [19] - 26:20, 23; 27:1, 3, 6, 9, 14, 16, 20, 23, 25; 28:3,

Detention Hearing 1/17/24

6, 10, 12, 14, 16, 19, 22
**Leidel's** [10] - 4:16, 24; 5:3; 9:6, 11, 13, 18; 19:13; 44:8; 45:13
**less** [1] - 35:7
**letting** [1] - 39:24
**library** [1] - 27:11
**lies** [1] - 10:21
**life** [2] - 27:8; 44:2
**limitation** [1] - 3:15
**limited** [1] - 35:13
**lines** [1] - 39:7
**link** [1] - 22:11
**lists** [2] - 23:6
**litem** [2] - 5:11; 6:10
**literally** [1] - 44:8
**litigation** [8] - 5:5, 15, 21; 6:11; 9:14; 11:10, 16
**live** [6] - 23:19; 28:8; 39:7, 24; 40:2; 45:4
**lives** [2] - 26:10; 28:11
**living** [5] - 16:3, 6-7; 40:4
**location** [5] - 14:11; 22:12; 30:10; 38:1; 42:18
**locked** [1] - 44:8
**logic** [1] - 22:25
**LONGMORE** [1] - 45:25
**Longmore** [1] - 45:19
**look** [10] - 7:4; 15:19; 16:11; 22:18; 30:23; 31:5; 32:11; 35:16; 39:3
**looked** [3] - 17:20; 18:22; 32:17
**looking** [5] - 16:25; 23:2; 41:25; 42:1; 44:17
**love** [3] - 44:16; 45:11
**Ma'am** [1] - 26:17
**ma'am** [3] - 15:10; 29:1
**Mac** [1] - 26:25
**Macbook** [1] -

26:23
**made-up** [1] - 33:21
**mail** [22] - 6:7, 19; 7:2, 11, 15; 8:4; 10:2, 4-5, 10, 18; 12:8; 18:18; 19:15; 20:25; 23:4, 6, 13-14; 32:15
**mailed** [1] - 33:22
**mailer** [3] - 7:25; 10:11; 32:16
**mails** [5] - 18:19; 20:18; 23:4, 11; 43:4
**manipulate** [1] - 43:17
**March** [6] - 4:17; 10:3; 23:14; 24:7; 35:3; 43:5
**Marshal** [1] - 45:14
**Maryland** [3] - 2:4; 23:7, 10
**mask** [2] - 10:14; 13:1
**material** [1] - 11:1
**matter** [4] - 11:14; 42:9; 43:7; 45:21
**mean** [17] - 14:17; 20:13; 21:21, 23; 22:22, 25; 27:14, 16; 31:24; 35:11, 16-17; 36:9; 37:5; 39:3; 43:21
**means** [1] - 43:18
**meant** [1] - 22:18
**medical** [4] - 18:24; 33:7, 14
**meet** [1] - 31:9
**member** [1] - 25:4
**members** [1] - 44:13
**mention** [2] - 30:1, 13
**mentioned** [2] - 11:8; 21:12
**mere** [1] - 19:7
**merit** [2] - 45:2
**message** [2] - 8:7, 10
**messages** [2] - 19:4; 43:4
**Michael** [1] - 2:10
**Middle** [3] - 3:22; 36:13; 41:12

**might** [3] - 5:13; 16:15; 21:9
**military** [1] - 33:8
**million** [1] - 17:4
**minor** [1] - 36:3
**misleading** [1] - 14:10
**misrepresentati on** [1] - 10:21
**mitigate** [1] - 30:18
**mobile** [1] - 12:25
**Mobile** [4] - 8:18, 20; 9:2; 14:22
**model** [1] - 22:5
**moment** [3] - 14:16; 35:23; 39:2
**Monday** [2] - 28:15
**Monique** [2] - 26:18, 20
**monitoring** [1] - 30:10
**month** [3] - 12:19; 13:5; 31:11
**months** [2] - 23:17; 35:6
**morning** [6] - 2:6, 8, 12-13, 16, 19
**most** [7] - 4:14; 17:25; 18:12; 23:22; 30:9; 39:21
**mother** [1] - 16:11
**motion** [4] - 3:23; 4:23; 11:7; 15:2
**motive** [2] - 33:5, 25
**MR** [24] - 2:8, 25; 3:3, 6; 14:20; 21:5, 7; 31:2, 14, 19, 22; 32:2, 4; 34:3, 6; 35:10, 23; 36:2, 5, 22; 41:17, 25; 42:6; 45:15
**MS** [79] - 2:13, 18; 15:11, 17, 24; 16:1, 4, 7, 9, 18, 21; 17:7, 14, 19; 18:6, 9; 20:1, 6, 9, 16, 21; 21:10, 23, 25; 22:4, 13; 23:1, 13, 16; 24:10; 25:6, 9, 12, 15, 21, 23; 26:1, 5, 7, 11, 14, 20, 23; 27:1, 3, 6, 9, 14, 16,

20, 23, 25; 28:3, 6, 10, 12, 14, 16, 19, 22, 25; 29:3, 9, 11, 14, 16, 19; 36:12; 37:15; 38:14, 25; 39:18; 40:6, 10; 41:1, 11, 19, 23; 42:8
**multiple** [1] - 21:11
**must** [3] - 19:9; 38:3; 42:19
**myriad** [1] - 31:5
**name** [3] - 6:9; 8:12; 26:19
**named** [1] - 6:8
**narrows** [1] - 21:8
**Navy** [2] - 8:3
**near** [1] - 25:16
**necessary** [1] - 11:9
**need** [1] - 42:14
**never** [5] - 10:20; 19:25; 36:10; 37:20; 39:25
**new** [2] - 38:5; 42:22
**nine** [1] - 35:6
**no-computer** [1] - 24:20
**no-Internet-capable** [1] - 24:21
**noncompliance** [2] - 36:17
**none** [1] - 37:18
**Norfolk** [3] - 5:7; 11:13; 35:19
**notarized** [6] - 38:3; 41:5, 7, 9, 16; 42:19
**note** [1] - 31:19
**nothing** [7] - 15:18, 21; 16:1; 17:7, 9; 19:21; 23:2
**notwithstanding** [1] - 8:16
**NOV** [1] - 36:11
**November** [3] - 6:15; 35:6
**now-proposed** [1] - 24:19
**Number** [1] - 2:10
**number** [14] - 3:25; 7:5, 14; 8:7, 20, 25; 9:1; 12:22; 13:6, 11; 19:7; 21:12;

42:2
**numbers** [2] - 13:9; 22:10
**nursing** [5] - 23:20, 22; 25:9, 25; 26:8
**obfuscate** [1] - 13:2
**obfuscated** [2] - 32:15
**obfuscation** [2] - 6:4; 7:2
**obstruct** [1] - 11:4
**obstruction** [1] - 4:4
**obstructive** [1] - 4:4
**obviously** [8] - 4:12; 10:5; 11:2; 13:7; 15:5; 31:6; 32:4; 35:11
**occupied** [1] - 36:25
**occur** [1] - 44:7
**occurred** [3] - 4:15; 16:13; 24:24
**October** [6] - 3:8; 6:15; 9:7; 11:12; 35:6, 12
**odious** [1] - 32:22
**OF** [1] - 45:19
**offense** [1] - 32:13
**Officer** [4] - 2:18; 36:13; 43:22
**officer** [5] - 2:20; 29:17; 30:22; 41:9, 12
**OFFICIAL** [2] - 45:19, 25
**often** [2] - 30:12, 14
**Ohio** [1] - 33:10
**old** [1] - 39:17
**older** [1] - 29:12
**oldest** [1] - 29:12
**on-and-off** [1] - 7:18
**one** [35] - 4:2; 5:14; 6:25; 9:12; 10:9; 11:6, 18; 12:4; 14:5, 16; 15:12; 18:23; 19:22; 23:4, 11; 24:21, 25; 29:9; 30:2; 32:18; 33:4, 14; 34:10, 24; 35:23; 36:23; 37:22;

39:2; 41:7, 17; 43:9, 14
**operating** [3] - 12:3; 17:3; 22:9
**opinion** [1] - 25:2
**opportunity** [3] - 12:4, 14; 41:2
**oppose** [1] - 41:1
**order** [6] - 4:18; 11:15; 18:9, 14; 42:13; 45:14
**ordered** [2] - 18:10; 42:16
**origin** [1] - 13:2
**original** [3] - 6:4; 11:7; 31:4
**originally** [5] - 3:8; 7:15, 19; 13:14; 34:11
**originating** [1] - 8:1
**ostensively** [1] - 13:22
**oversight** [1] - 9:9
**own** [8] - 17:4; 24:17; 26:22; 32:7; 33:24; 39:14; 40:20; 44:2
**p.m** [1] - 28:6
**papers** [1] - 15:20
**paramour** [1] - 32:23
**parents** [13] - 3:13, 16; 12:16; 14:5; 18:11, 14; 23:19; 30:11; 40:4, 7; 41:16; 44:11; 45:8
**parents'** [4] - 12:2; 18:16; 33:17; 36:25
**part** [7] - 4:9; 14:14; 18:13; 23:1; 32:22; 33:1; 34:3
**particular** [2] - 10:10; 29:23
**partner** [1] - 7:18
**parts** [1] - 42:15
**party** [27] - 3:12; 5:10; 9:12; 12:4, 13; 14:3; 15:22; 23:24; 24:19; 25:6; 29:5, 22; 30:7, 10; 34:11, 22; 38:2; 41:6; 42:19; 43:21; 44:13, 19, 21; 45:7

password [7] - 18:10, 15, 17; 37:10; 38:6; 42:24; 44:10
pattern [1] - 33:1
Patterson [1] - 33:10
Pause [3] - 14:19; 25:14; 36:1
pending [1] - 41:20
Pennsylvania [5] - 3:22; 22:22; 23:3; 36:14; 41:13
people [5] - 13:16; 17:4; 18:12; 20:24
people's [1] - 17:25
perform [1] - 4:19
perhaps [1] - 39:10
period [5] - 3:9; 7:19; 36:17; 44:4, 9
permission [1] - 35:18
permitted [1] - 44:9
perpetrate [1] - 32:13
persisting [1] - 2:23
person [5] - 33:19; 38:6; 42:23; 44:16
pertinent [1] - 42:15
Peter [1] - 6:8
petitioned [1] - 3:10
phone [33] - 8:7, 20, 24; 9:1, 9, 13; 11:25; 12:7; 13:6, 9, 11, 19-20, 22-23; 14:11, 15; 16:12, 23; 17:4; 19:7; 21:13; 22:5, 7; 26:1; 37:6, 11; 38:8
phone's [1] - 21:16
phones [8] - 18:13, 16; 38:6; 40:15; 42:23
Pinger [5] - 8:23; 13:23; 14:22; 19:4

Playstation [3] - 17:23; 37:1, 13
pleading [1] - 24:13
point [5] - 9:19; 30:25; 31:24; 34:25; 37:2
posit [1] - 20:17
position [14] - 3:7; 4:14; 5:14; 9:3; 11:19; 12:10; 14:13; 15:19, 23; 16:1; 25:5; 29:20; 30:17
possession [4] - 9:6, 11, 18; 30:6
potential [2] - 4:8; 9:25
potentially [2] - 9:24; 25:17
prepared [1] - 35:14
presented [1] - 44:22
presiding [1] - 2:5
pretrial [8] - 2:17; 30:17; 36:10; 38:16; 39:6; 40:25; 41:9
Pretrial [1] - 2:18
pretty [1] - 30:8
previous [3] - 6:21; 14:3; 15:3
previously [5] - 6:12; 15:3; 30:6, 16, 19
privileged [1] - 9:16
probable [8] - 4:2, 21; 9:22; 15:4; 19:10; 32:7; 43:19
problem [6] - 24:3, 13, 18; 39:3; 40:16; 44:12
problems [2] - 13:12; 35:7
proceeding [1] - 11:14
proceedings [2] - 45:18, 21
Proceedings [3] - 14:19; 25:14; 36:1
process [2] - 10:13; 14:21
proctor [1] - 41:15

Proctor [1] - 2:14
PROCTOR [2] - 41:17, 25
proctor's [1] - 42:20
Professional [1] - 45:19
professional [2] - 33:16; 43:23
proffer [2] - 4:12; 43:4
proffers [2] - 19:13; 22:2
prohibition [1] - 13:7
prompted [1] - 4:22
prong [1] - 8:15
pronounce [1] - 6:9
proof [3] - 30:25; 32:6; 45:3
proofreading [1] - 13:23
proposed [3] - 23:23; 24:19; 34:11
prosecutor [1] - 7:13
protect [4] - 5:3; 38:6; 42:24
protected [4] - 18:10, 15, 17; 44:10
Protocol [3] - 8:9; 34:10, 15
Protocols [1] - 34:9
provable [1] - 21:4
proved [2] - 33:21, 24
proven [1] - 39:22
provide [1] - 37:22
provided [6] - 10:24; 13:21; 14:2; 33:15; 41:12
provider [1] - 13:10
Proxy [1] - 12:25
PS [1] - 38:10
PS5 [3] - 17:23; 37:20; 40:7
psychiatrist [1] - 33:9
psychiatrists [2] - 33:9, 13
pulling [1] - 39:1

pun [4] - 21:20; 38:12
purported [3] - 8:4; 32:22
purportedly [4] - 5:2, 25; 6:8; 10:2
purporting [3] - 6:20; 33:8
purposes [2] - 5:21; 11:15
put [6] - 18:9; 22:3; 34:8; 35:3; 39:5; 42:12
putting [2] - 35:4, 10
quality [1] - 14:2
questions [6] - 15:8, 14; 26:14; 28:24; 32:14; 36:23
raise [1] - 26:17
raised [1] - 34:25
rather [4] - 3:13; 13:3; 31:16; 32:21
raw [1] - 23:5
reach [1] - 9:23
read [3] - 21:10; 24:13; 42:3
reading [2] - 39:6
real [1] - 38:24
realize [1] - 32:7
really [6] - 14:10; 15:19; 35:1, 16; 43:9
Realtime [1] - 45:20
reason [1] - 16:23
reasonable [2] - 32:6; 45:3
reasonably [1] - 24:1
reasons [1] - 31:15
received [3] - 8:7; 19:15, 21
receiving [1] - 36:14
recently [1] - 4:9
recess [1] - 45:17
recipients [1] - 10:15
recognize [1] - 13:8
recommendatio n [1] - 13:16
record [4] - 5:4; 33:7, 14; 42:3
recorded [2] -

45:20
recording [2] - 45:22
records [7] - 14:22; 19:20; 21:2, 13; 22:15; 25:17; 33:8
recovered [1] - 14:21
referenced [1] - 10:1
referring [2] - 23:12; 36:18
refers [1] - 8:12
regard [2] - 9:20; 11:25
regarding [2] - 6:14; 14:23
regards [2] - 18:18; 19:16
Registered [1] - 45:19
related [1] - 39:21
Relations [2] - 34:17, 22
relations [1] - 5:5
relationship [1] - 19:6
relative [1] - 33:17
relaxes [1] - 23:23
release [28] - 3:24; 4:7, 16, 25; 5:24; 6:5; 9:24; 11:23; 12:15; 13:5; 15:4; 24:5, 8, 23; 29:5; 34:2; 35:4; 37:16; 38:9; 39:20, 22; 40:12; 41:2, 20; 42:10, 12-13; 44:25
released [6] - 3:12, 18; 6:24; 12:21; 24:3; 30:9
releasing [1] - 6:22
relevant [1] - 5:18
reliability [1] - 33:19
rely [1] - 18:13
remaining [1] - 45:8
remains [1] - 5:5
remanded [1] - 45:13
remember [1] - 41:17
reminded [1] -

14:21
remove [1] - 3:17
removed [3] - 12:17; 38:4; 42:21
removing [1] - 37:18
reported [1] - 36:19
REPORTER [2] - 45:19, 25
Reporter [2] - 45:19
represent [4] - 4:20; 5:9; 31:20; 34:18
representation [2] - 36:23; 42:20
representations [2] - 14:23; 19:14
represented [3] - 13:25; 15:1; 37:5
request [5] - 5:1, 24; 6:1; 19:25; 21:14
requested [2] - 5:20; 11:12
required [1] - 12:16
reserving [1] - 2:22
residence [9] - 12:2; 17:12, 18; 18:5; 21:3; 37:1, 7; 44:9
resolve [1] - 34:20
resolved [1] - 6:25
respect [2] - 31:7; 35:12
response [2] - 31:2; 36:23
responsibility [1] - 5:16
rest [1] - 34:7
restrict [2] - 38:7; 42:25
restrictions [6] - 4:10; 20:7; 24:1; 29:4; 36:6; 40:13
restrictive [2] - 39:21; 43:12
resulted [1] - 43:3
resulting [1] - 23:9
revealed [1] - 7:24

**revocation** [1] - 36:15
**revoke** [5] - 3:23; 4:23; 11:7; 15:2; 35:2
**revoked** [1] - 35:21
**rid** [1] - 16:23
**rise** [2] - 2:3; 45:16
**risk** [2] - 25:10; 30:18
**road** [1] - 43:24
**room** [1] - 36:24
**rough** [1] - 35:6
**RPR** [1] - 45:25
**run** [1] - 28:17
**Sarah** [14] - 7:15, 17, 22; 8:6, 12, 22, 25; 9:4, 20, 25; 19:5, 10
**satisfaction** [1] - 33:24
**satisfied** [1] - 32:6
**satisfy** [1] - 14:1
**saw** [1] - 36:10
**scenario** [1] - 25:24
**schedule** [1] - 45:10
**school** [10] - 11:18; 23:23; 25:9, 25; 27:9; 28:2; 35:20; 40:21; 45:10
**schools** [1] - 26:16
**scope** [2] - 5:15; 11:20
**Scranton** [13] - 16:3, 6-7; 17:6, 8; 21:4; 22:21; 23:3; 37:14; 39:8, 13; 40:19; 45:7
**search** [14] - 3:21; 4:23; 12:2; 14:8; 16:9, 17-18; 17:7, 13; 18:15; 19:16; 37:14
**season** [1] - 31:20
**seat** [1] - 2:7
**seated** [1] - 2:14
**second** [1] - 41:18
**secondarily** [1] - 6:24
**secure** [2] - 33:7, 15

**see** [3] - 17:21; 19:9; 25:8
**seeing** [1] - 21:11
**seized** [1] - 9:9
**selling** [1] - 17:4
**send** [3] - 19:14, 19; 23:8
**sender** [1] - 7:25
**sending** [7] - 9:4; 10:10, 14; 15:13; 19:22; 20:18, 24
**sense** [1] - 43:16
**sent** [13] - 8:21-24; 9:1, 4; 10:2; 18:19; 19:5, 9; 20:10; 21:15; 23:5
**September** [1] - 35:5
**seriously** [1] - 10:5
**service** [1] - 13:10
**service's** [1] - 30:17
**Services** [1] - 2:18
**session** [1] - 2:4
**set** [4] - 30:8, 16, 18; 43:1
**setting** [2] - 37:16; 42:13
**shall** [1] - 42:18
**shortly** [4] - 4:24; 5:23; 6:5; 12:21
**show** [2] - 33:9; 45:11
**showed** [2] - 8:22; 33:5
**sic** [1] - 30:13
**sides** [1] - 34:17
**signed** [2] - 42:1
**signing** [1] - 41:20
**similar** [4] - 7:5; 17:1; 38:1; 42:17
**similarity** [2] - 8:2; 11:5
**simple** [1] - 38:10
**simply** [5] - 10:18; 31:9; 36:8, 22
**simultaneous** [1] - 8:14
**sister** [9] - 23:19; 29:9; 30:12; 39:25; 40:21; 44:1, 11
**sisters** [1] - 29:7
**sit** [2] - 31:25

**skills** [2] - 43:16
**Smart** [1] - 30:6
**Smartphone** [1] - 29:25
**SMITH** [56] - 2:13; 15:11, 17, 24; 16:1, 4, 7, 9, 18, 21; 17:7, 14, 19; 18:6, 9; 20:1, 6, 9, 16, 21; 21:10, 23, 25; 22:4, 13; 23:1, 13, 16; 24:10; 25:6, 9, 12, 15, 21, 23; 26:1, 5, 7, 11, 14; 28:25; 29:3, 9, 11, 14, 16; 37:15; 38:14, 25; 39:18; 40:6, 10; 41:1, 19, 23; 42:8
**Smith** [9] - 2:13; 17:16; 26:21; 29:2; 30:24; 34:25; 37:12; 41:15; 42:7
**Smith's** [1] - 45:1
**smoke** [1] - 30:24
**software** [1] - 22:6
**someone** [4] - 7:9; 18:25; 19:10; 20:22
**sometimes** [4] - 27:14, 23; 30:1, 14
**somewhere** [3] - 22:21; 27:13; 41:5
**son** [1] - 24:16
**son's** [1] - 13:5
**Sorg** [13] - 7:15, 17, 22; 8:6, 22, 25; 9:4, 20, 25; 19:5, 8
**Sorg's** [1] - 8:12
**sort** [7] - 5:23; 8:15; 10:13, 23, 25; 30:3; 37:6
**source** [1] - 6:4
**Special** [2] - 2:11; 6:20
**specific** [4] - 4:7; 15:8; 22:17; 34:23
**specifically** [6] - 3:15; 4:3; 5:19; 12:18; 18:9; 23:3
**speculate** [1] -

8:12
**spell** [1] - 4:1
**spells** [1] - 3:14
**spend** [1] - 33:2
**spoken** [2] - 5:10; 36:14
**spoofed** [2] - 7:15; 23:13
**spouses** [1] - 20:12
**stalking** [3] - 4:5; 7:21; 32:13
**stalking-like** [1] - 4:5
**stand** [2] - 31:24
**standard** [2] - 32:7
**standing** [1] - 28:24
**stands** [1] - 45:16
**started** [1] - 34:16
**States** [3] - 2:3, 9, 11
**stationed** [1] - 33:11
**stay** [1] - 30:2
**stayed** [1] - 41:20
**staying** [1] - 41:2
**step** [1] - 40:16
**stepped** [1] - 15:21
**still** [2] - 2:23; 8:18
**stop** [1] - 36:16
**store** [1] - 25:13
**strict** [7] - 3:13-15; 11:21; 23:25; 24:4; 36:5
**strictest** [1] - 39:5
**strike** [1] - 12:19
**string** [4] - 21:24; 22:4, 10, 14
**stringent** [3] - 24:20; 30:9; 44:25
**strings** [4] - 21:13, 16-17; 22:16
**student** [4] - 11:19; 23:20, 22; 26:8
**stuff** [2] - 14:13; 34:8
**subject** [1] - 43:6
**submissions** [1] - 10:12
**submit** [9] - 4:2; 7:11; 9:21; 13:12; 15:1, 9;

29:3; 31:15; 32:10
**submitted** [8] - 3:20; 5:1, 24; 6:2; 7:11; 19:25; 31:4
**subpoenaing** [2] - 19:19
**subscribed** [1] - 9:2
**subsequent** [1] - 3:9
**subsequently** [2] - 3:25; 9:10
**substantive** [1] - 43:7
**successful** [1] - 40:5
**suffice** [1] - 12:10
**suggest** [2] - 5:13; 14:10
**suggested** [2] - 12:7, 12
**suggesting** [3] - 7:9; 23:18; 34:6
**suitable** [2] - 29:22; 43:22
**Sullivan** [2] - 2:5, 8
**summarize** [3] - 3:6; 4:11, 13
**summation** [1] - 5:23
**Super** [1] - 12:25
**superseded** [1] - 31:14
**supervise** [1] - 40:25
**supervised** [1] - 36:13
**supervision** [2] - 14:2; 35:7
**support** [6] - 3:21; 6:11; 14:23; 19:16; 31:4; 45:12
**supposed** [1] - 8:17
**supposedly** [1] - 7:1
**supposition** [1] - 20:18
**surrounding** [1] - 32:14
**suspicious** [3] - 12:12; 13:13; 24:23
**swear** [5] - 3:16; 38:3; 41:2, 7; 42:19

**sweep** [1] - 38:17
**sworn** [1] - 26:18
**system** [5] - 17:3; 22:9; 33:15, 23
**systems** [4] - 19:1; 24:12; 37:25; 42:16
**T-Mobile** [4] - 8:18, 20; 9:2; 14:22
**table** [1] - 2:11
**Tang** [2] - 2:12; 14:20
**target** [1] - 20:11
**technically** [1] - 35:21
**technology** [1] - 43:18
**teenage** [1] - 40:2
**telephones** [1] - 18:12
**telephonically** [1] - 6:13
**television** [1] - 17:20
**televisions** [1] - 18:1
**terms** [1] - 9:24
**terrible** [1] - 44:19
**tested** [1] - 17:20
**testing** [1] - 19:9
**text** [6] - 8:7, 22; 9:1; 19:4; 32:15; 43:4
**texted** [1] - 19:7
**texts** [1] - 20:18
**THE** [103] - 2:3, 6, 16, 20; 3:1, 5; 14:18; 15:10, 16, 19, 25; 16:3, 6, 8, 14, 20; 17:6, 11, 16; 18:4, 8; 19:23; 20:4, 7, 13, 17; 21:1, 6, 8, 18, 24; 22:2, 10, 18; 23:11, 15; 24:2, 11; 25:8, 11, 19, 22, 24; 26:3, 6, 8, 13, 15, 19, 21, 24; 27:2, 4, 7, 13, 15, 18, 21, 24; 28:1, 4, 8, 11, 13, 15, 18, 20, 23; 29:1, 7, 10, 12, 15, 17; 30:21; 31:11, 18, 21, 24; 32:3; 34:1, 5, 24; 35:16, 25;

36:4, 10, 20; 37:12, 24; 38:20; 39:3, 19; 40:9, 18; 41:4, 15, 22, 24; 42:4, 7, 9; 45:16
**then-wife** [1] - 33:11
**theory** [1] - 29:21
**thereafter** [1] - 7:14
**third** [27] - 3:12; 5:10; 9:12; 12:4, 13; 14:3; 15:22; 23:24; 24:19; 25:6; 29:5, 22; 30:7, 10; 34:11; 38:2, 19; 41:6; 42:19; 43:21; 44:13, 19, 21; 45:7
**third-party** [26] - 3:12; 5:10; 9:12; 12:4, 13; 14:3; 15:22; 23:24; 24:19; 25:6; 29:5, 22; 30:7, 10; 34:11; 38:2; 41:6; 42:19; 43:21; 44:13, 19, 21; 45:7
**three** [1] - 8:15
**three-prong** [1] - 8:15
**Thursday** [1] - 28:17
**tied** [1] - 33:3
**ties** [2] - 16:2; 23:3
**tighten** [1] - 40:13
**Timothy** [1] - 2:5
**today** [7] - 23:20; 31:25; 39:25; 42:15; 43:4, 9; 44:22
**together** [2] - 2:21; 34:8
**took** [1] - 12:3
**totally** [2] - 12:24; 45:1
**tracked** [2] - 33:21; 34:9
**tracking** [1] - 34:9
**transcribed** [1] - 45:21
**transcript** [2] - 45:20, 22
**transmission** [1] - 8:9
**transmissions** [1]

- 12:9
**travel** [8] - 4:11; 5:19, 21; 11:13, 15, 20; 35:12, 14
**tried** [1] - 11:9
**troubled** [1] - 44:5
**true** [1] - 10:5
**trunk** [1] - 40:23
**trust** [6] - 24:14, 19, 21; 25:3; 43:22, 25
**try** [4] - 19:11; 24:2; 38:23; 44:24
**trying** [9] - 7:12; 9:15; 13:1; 19:10; 20:14, 17; 33:19; 35:11; 39:19
**turn** [2] - 33:19; 43:10
**turned** [4] - 7:23; 9:13; 24:16; 40:5
**two** [13] - 4:1; 6:7; 7:1; 10:11; 16:25; 19:6; 21:14; 30:1, 10; 33:9; 40:16; 43:1, 9
**two-step** [1] - 40:16
**tying** [1] - 15:18
**typographical** [1] - 7:8
**um-hmm** [1] - 27:1
**unauthorized** [1] - 36:16
**under** [10] - 11:20; 14:1; 15:6; 24:1, 4, 7, 22; 34:1, 14; 43:10
**underlying** [8] - 7:5, 20; 8:2; 10:14; 34:14, 19; 43:7, 20
**undermine** [1] - 10:6
**understood** [1] - 19:24
**undertook** [1] - 32:12
**unfortunately** [1] - 9:8
**United** [3] - 2:3, 9, 11
**universe** [1] - 22:21

**unknown** [1] - 13:16
**unless** [2] - 15:8; 22:23
**unlikely** [1] - 43:15
**Unlimited** [1] - 12:25
**unmonitored** [1] - 44:4
**unusual** [2] - 5:1, 24
**up** [6] - 12:20; 18:11; 33:21; 39:1, 4; 41:16
**US** [1] - 2:18
**user** [10] - 17:1; 21:13, 16, 20, 24; 22:4, 14, 16
**uses** [1] - 32:25
**USUHS** [4] - 18:24; 33:7, 15, 23
**variety** [2] - 10:15; 32:12
**vehicle** [1] - 12:3
**verification** [3] - 19:21; 20:23; 40:16
**verifying** [1] - 9:4
**version** [3] - 22:6
**versus** [1] - 2:9
**via** [4] - 8:23; 11:12; 14:21; 45:21
**victim** [3] - 20:4, 11
**violated** [4] - 4:7; 12:12; 38:15; 39:22
**violates** [1] - 38:11
**violating** [1] - 4:9
**violation** [6] - 9:24; 11:23; 13:25; 35:4, 13; 36:10
**violations** [6] - 4:15, 22; 15:3; 30:5, 16; 36:18
**Virginia** [4] - 5:7; 6:11; 11:13; 33:17
**virtual** [1] - 26:16
**virtue** [1] - 10:7
**visited** [1] - 34:12
**Voice** [1] - 8:9
**VPN** [2] - 12:25; 17:9
**VPN-Super** [1] -

12:25
**waitress** [1] - 27:25
**wants** [3] - 20:8; 43:18; 44:1
**warrant** [7] - 14:9; 16:9, 17; 17:7; 19:16; 43:3
**warrants** [2] - 3:21; 12:2
**ways** [3] - 4:19; 32:12, 19
**website** [3] - 18:25; 19:1, 3
**weeds** [1] - 20:14
**week** [1] - 28:2
**weeks** [2] - 6:7; 7:1
**weird** [1] - 26:15
**wheel** [2] - 25:1
**wicked** [2] - 43:15
**wife** [7] - 5:3, 7, 12, 25; 10:3; 19:14; 33:11
**WiFi** [4] - 16:11; 18:2; 37:18
**WiFi-capable** [2] - 18:2
**willing** [3] - 40:1; 44:3, 7
**witness** [2] - 9:25; 10:22
**witnesses** [1] - 4:8
**wives** [2] - 44:14
**word** [3] - 32:25; 36:14; 39:23
**works** [4] - 25:12, 16; 28:16; 40:21
**world** [3] - 21:9; 45:3
**worst** [2] - 44:16
**worth** [1] - 25:2
**Wright** [1] - 33:10
**Wright-Patterson** [1] - 33:10
**write** [4] - 7:7, 10; 36:11; 41:16
**written** [2] - 7:4, 9
**Xinis** [14] - 3:11; 11:22; 13:25; 18:10; 24:2; 30:8; 38:9; 39:4, 20; 41:23; 42:13; 43:1, 14
**year** [2] - 4:24; 31:20
**years** [1] - 19:6