IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA,      )
                               )
          vs.                  )   CRIMINAL CASE NO. LKG-22-380
                               )
JASON MICHAEL LEIDEL           )


Monday, October 24, 2022
Courtroom 7B
Baltimore, Maryland

DETENTION HEARING

BEFORE:  THE HONORABLE A. DAVID COPPERTHITE, Magistrate Judge


On Behalf of the United States:

     P. MICHAEL CUNNINGHAM, ESQUIRE
     THOMAS SULLIVAN, ESQUIRE
     Office of the United States Attorney
     36 South Charles Street, 4th Floor
     Baltimore, MD 21201

On Behalf of the Defendant:

     GARY E. PROCTOR, ESQUIRE
     JENNIFER SMITH, ESQUIRE
     Law Offices of Gary E. Proctor
     233 East Redwood Street
     Baltimore, MD  21202


_____
Proceedings Recorded by Audio Recording
Transcript Produced by Computer-Aided Transcription

Reported by:  Kassandra L. McPherson, RPR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, MD 21201
(410) 962-4544

P R O C E E D I N G
10:42 a.m.

THE COURT:  Good morning, everyone.  You can be seated.

Mr. Cunningham, you can call the case, please.

MR. CUNNINGHAM:  Good morning, Judge Copperthite.  May I remove my mask while speaking?

THE COURT:  Yes.  Counsel, if you're at the table it's up to you.  If you want to take your mask off that's fine.  You don't have to wear it, but if you want to wear it that's perfectly fine as well.

MR. CUNNINGHAM:  Thank you, Your Honor.

Call the case of United States versus Jason Leidel, Criminal Docket Number 22-MJ-03965.  Michael Cunningham and Thomas Sullivan for the United States.

And with us at counsel table today is FBI Special Agent Kevin Quo.  We are here this morning for a detention hearing.

THE COURT:  Okay.  Thank you.  You can be seated.

Mr. Proctor.

MR. PROCTOR:  Thank you, Your Honor.  Gary Proctor with Jennifer Smith.  The Federal Public Defender was previously appointed to this case but they had a conflict and had to get out, and Ms. Essex asked me to accept the appointment.  So I haven't seen any paperwork and I haven't entered my appearance, I apologize, but I believe those will all be remedied before the

end of the day.

THE COURT:  But there was a financial affidavit that was filed in this case initially?

MR. CUNNINGHAM:  There was, Your Honor.

MR. PROCTOR:  By the Federal Public Defender.

THE COURT:  All right.  Then I'll appoint you --

MR. PROCTOR:  Thank you.

THE COURT:  -- Mr. Proctor and Ms. Smith.  Good morning to both of you.  You can be seated.

Has everyone received the original Pretrial Services report?

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  As well as the addendum dated October 21st?

MR. PROCTOR:  Yes, sir.

MR. CUNNINGHAM:  Yes.

THE COURT:  Okay.  All right.  Are we ready to proceed then?

MR. CUNNINGHAM:  Yes, Your Honor.

Judge, I had sent to your chambers on Friday, in anticipation of the proceeding, a copy of the complaint as well as the redacted affidavit that was in support of that, which I also copied Mr. Proctor on.  Primarily because I felt that it would, hopefully, expedite and lend some expediency to the proceeding today.

It's a lengthy affidavit.  It identifies essentially the evidence that has been gathered during the course of the investigation that resulted in the charges, and it forms the basis of the Government's contention on the two primary reasons that we're seeking detention.

1.  Is risk of flight; and.

2.  Is the -- and I would suggest probably the stronger of the Government's two positions, is that the defendant, if released, would continue to present a risk of obstructive behavior, terroristic threats, intimidation as is reflected throughout the history of essentially the more than four years since he and his ex-wife separated in the summer of 2018.

At this point in time, Your Honor, I'm happy to -- I don't know, I guess, my first question would be have you had the opportunity to see the affidavit, and is it something that at least, if the Government submits on that, then I can add to -- add to that in the context of our argument.

THE COURT:  I've read the affidavit and it is very extensive, as you stated.  I don't remember how many pages it is but I think that it is --

MR. CUNNINGHAM:  It's about 86, close to 90 pages.

THE COURT:  -- close to 90 pages total.

So, yes, I'm very familiar with the allegations in the affidavit and the facts, but I still would ask the Government to summarize --

MR. CUNNINGHAM:  Yes, sir.

THE COURT:  -- and certainly supplement any of those facts.

MR. CUNNINGHAM:  Certainly.

Before going there, Judge, on Thursday we had indicated that the defendant's ex-wife had requested, pursuant to 18 U.S.C., I think it's --

THE COURT:  2263.

MR. CUNNINGHAM:  -- 2263, an opportunity to present a statement to the Court.  She has traveled here from her residence in Virginia and is prepared to do so if Your Honor would permit at this time.

THE COURT:  Yes.  Certainly.  I will be happy to hear from Ms. Leidel.  She can stand at the -- I think where Special Agent Quo is.

MR. CUNNINGHAM:  Okay.

THE COURT:  The microphone there.

MR. CUNNINGHAM:  Would you please remove your mask. Sir, do you want her placed under oath?

THE COURT:  Yes, why don't we swear the witness.

(ERICA SWENSON, duly sworn.)

THE CLERK:  Please state your name for the record.

THE WITNESS:  Erica Swenson.

THE CLERK:  Thank you.

MR. CUNNINGHAM:  You may be seated, please.

BY MR. CUNNINGHAM:

Q.   Ms. Swensen, I'm going to ask you to please speak loudly and clearly.

You were seated in the back of the courtroom when I identified you as the former spouse of the defendant, Jason Leidel; is that correct?

A.   Yes, sir.

Q.   And how long were you married to Mr. Leidel?

A.   Approximately 12 years.  Well, 13.  The divorce took three years to go through but --

Q.   Okay.  So you essentially were separated from him beginning in the summer of 2018; is that right?

A.   Yes, sir.

Q.   When were you initially married?

A.   We were married in 2005.

Q.   And the affidavit laid this out so I'm not going to go into much detail.  But in the summer --

MR. PROCTOR:  Your Honor, I object.  Is this a direct examination or a victim statement?

THE COURT:  I think we can get some preliminary background and then she can make a statement.

Overruled.

BY MR. CUNNINGHAM:

Q.   In the summer of 2018 your husband was then re-assigned to another military position in the Washington, D.C.

area; is that right?

A.    Yes, sir.

Q.    And did you initially accompany him?

A.    I did initially.

Q.    And how long did you remain with him in his new assignment?  And that was at Uniformed Services University for Health Sciences, right?

A.    Yes, sir.

Q.    How long did you remain there?

A.    Approximately 30 days.

Q.    All right.  And after that did you essentially initiate a separation proceeding?

A.    Yes.  I left the residence on July 31st, I believe, of 2018.

Q.    Had you indicated to Mr. Leidel that you intended to pursue a separation toward divorce?

A.    Yes.

Q.    What was his reaction to that?

A.    He at first was asking, you know, to stay and reconsider, and I said no, and I attempted to leave and the keys were taken from the vehicles and I was not allowed to take my vehicle because it was a larger one.  And he made it very challenging to leave, among locking me in a room and pushing me around.

Q.    Ultimately you did leave?

A.    Yes, sir.

Q.    And you at some point in time returned to the Virginia Beach area?

A.    Yes.

Q.    Is that where you were located before coming to his assignment at USUHS?

A.    Yes.  That it was our previous orders and where my children had been going to school.

THE COURT:  Okay.  Mr. Cunningham, I think a lot of this is in the affidavit.

MR. CUNNINGHAM:  It is.

THE COURT:  Okay.

MR. CUNNINGHAM:  I'll get to the point then.

THE COURT:  Yeah.  Let's get --

Because my question for you, Ms. Swensen, is I have to make a decision here whether to release Mr. Leidel or to detain him pending the trial.  So what we want to hear from you, is you have a right to speak about that, whether he should be released or detained pending the trial.  So I would like to hear from you what your position is on that.

BY MR. CUNNINGHAM:

Q.    Did you understand the Judge's question?

A.    Yes.

Q.    Can you respond to it, please?

A.    Yes.

Your Honor, I believe that he's not going to stop. The harassment has continued either through abusive means or even through legal means.

I am in constant fear. My daughters' emotional state, both of them, is -- we're trying to get some normalcy and not wonder when the police are going to keep stopping by our house because of false emails or if my job's in jeopardy.

My daughter was just recently released from an in-residence program. She's trying to maintain some emotional stability and he hasn't stopped. It's continued to escalate and escalate and escalate over the course of four years, and I don't know what the next piece is.

I don't -- I constantly have to look around the corner. He's showed up in parking lots where we were. We just -- we don't know what is happening. And that level of what we have to exist in is -- it's traumatizing. And I would ask that he's not capable of doing that.

These are things through computers. He'll continue to have access to them if he is out right now. And I would like to not feel like that or for my children to feel like that all the time. It's -- it's been overwhelming and it is -- it is difficult to help them and help myself, and that's what my fear is.

THE COURT: All right. Ms. Swensen, since he's been arrested has there been any contact?

THE WITNESS:  Not since he has been arrested, no.

THE COURT:  Okay.

THE WITNESS:  Prior to the arrest, the most recent contact was on Monday and Tuesday prior to the Thursday arrest.

THE COURT:  What were those contacts?

THE WITNESS:  Those were through the -- the app for our children that we have to use through that court order.

THE COURT:  Yes.

THE WITNESS:  But it was asking about their whereabouts and what they were doing.  And then I was also served with another civil summons.  He did a show cause motion through our custody piece which he continues to do as another means of harassment.

THE COURT:  Does he contact -- has he had contact with your children directly?

THE WITNESS:  Yes.  And my children have asked him not to contact them anymore.

THE COURT:  Okay.

Mr. Cunningham --

I'm sorry, Ms. Swensen, is there anything else that you want to add to that?

THE WITNESS:  I don't believe so.  No, Your Honor.

THE COURT:  Okay.  Mr. Cunningham.

MR. CUNNINGHAM:  Thank you, Your Honor.  No, I have no other questions for Ms. Swensen.

THE COURT:  Okay.  Ma'am, you can have a seat back in the gallery.

MR. CUNNINGHAM:  Judge to be clear, and I don't want there to be an allegation here, I do believe there is a right in this context to cross-examine should Mr. Proctor want that opportunity.

THE COURT:  Sure.  Mr. Proctor, did you?

MR. PROCTOR:  Could I have a moment, please, Judge?

THE COURT:  Sure.

(Discussion off the record.)

MR. PROCTOR:  Thank you for allowing me the opportunity.  I have no questions for this either witness or victim.  Either way, I have no questions.

THE COURT:  Thank you, Mr. Proctor.

All right.  Mr. Cunningham, anything you want to put on the record in addition to --

MR. CUNNINGHAM:  Nothing further for the record, Judge.  We'll submit, obviously, on the affidavit, the merits of that, as it bears on what we contend are reasons for detention in this case.

THE COURT:  Okay.  The affidavit, which is very extensive as Mr. Cunningham has indicated, I think it's fairly close to 90 pages long, is very detailed facts and I will take those facts into consideration when I look at the factors here under 3142(g).

MR. CUNNINGHAM:  And, Judge, just very briefly, to summarize, what the affidavit lays out essentially is a four-year, essentially a scheme to inflict -- and I don't use this term lightly -- but domestic terrorism seems to come to mind.

This was a plan to essentially engage in a multi-faceted approach to attacking Mrs. Leidel.  Such things as sending spoofed emails purporting to be from anonymous third persons that interfered with her account.  Making a -- creating an email that purported to be from her to a man with who she was allegedly having an extra-marital relationship that read as if she was at an abortion clinic where that paramour had caused her to go for an abortion.  And the language in the email is the kind that it was hideous.  I mean, there's use of the N-word in there, essentially ascribing to her sort of a racism in the context of having an unwanted abortion.  And this then, in turn, was subject to public dissemination.

I mentioned, obviously, the interference with the -- with her employment position or attempted interference with that.

The nature of obstructive behavior is -- comes up in several ways that I just want to highlight here.  One was the use of an extortion letter purportedly sent from Erica Leidel to Sarah Sword who was then the co-defendant of Mr. Leidel with whom he was residing.  This extortion letter was postmarked in Richmond, Virginia on or about the 15th of September.  And I

apologize, I should have the date immediately in my hand, in 2019.

But the scheme around that was really sort of -- it shows the collusion here and the degree to which the defendant and Ms. Sword went to essentially perpetrating a fraud on the domestic relations court in Virginia as well as the criminal courts here in Montgomery County.

Ms. Sword received the extortion letter.  The Government doesn't have the extortion letter by the way, or at least we hadn't had it prior to last Thursday.  So I don't, obviously, know where the extortion letter may be at this point in time. But it purportedly was a demand by Ms. then Erica Leidel against Sarah Sword.  They reported it to the Montgomery County Police which resulted in criminal process, back and forth allegations of violations of different protective orders.

But, in essence, it's the Government's contention, obviously, and I appreciate that at this juncture there haven't been findings of fact as to that, but certainly the evidence suggests that this was a document that had been mailed; crafted by the defendant, and then mailed by him from Richmond while he was on a trip that he didn't otherwise make his presence known to Ms. Leidel or the children, but he was in the Virginia Beach area as reflected in the hotel receipt.  The fact of which he shared with Ms. Sword indicating their meeting of the minds on this particular point.

Then the other aspect of this that I think reflects on the degree to which the defendant is capable and willing to engage in obstructive behavior is the issue of the falsified medical records. And you'll recall and, if necessary, Judge, I can -- we can get you the specific paragraph. But in the course of the litigation involving the child custody and domestic relations in Virginia, a medical professional had been appointed by the court system down there to assess the capacity of each parent to serve in a custodial -- with custodial responsibilities.

And Mr. Leidel submitted to the -- this medical professional a document that purported to be an extract of Erica Leidel's record that reflected mental health treatment. It purportedly came from medical records generated from the 86th Medical Group, I think was the organization. But it was a medical organization at Wright-Patterson Air Force base in Ohio where the defendant had been assigned while on active duty in the Air Force. And it allegedly showed two different physicians writing about mental health treatment for Ms. Leidel.

Well, Agent Quo essentially reached out to both of those physicians and neither one of them had seen Ms. Leidel. Of course, she, as indicated in the affidavit, she denied that she had ever received any kind of -- at least at that time had received any kind of mental health treatment.

And ultimately the medical professional in Virginia to whom the defendant had submitted this document, could not verify it

so she did not credit it and it didn't weigh on her decision-making.  But had it been something that she had been able to, say, verify, it would have had an impact.

Significantly though, it reflects the degree to which the defendant was willing and able to go to try to perpetrate a fraud and obstruct somebody's ability to really determine the facts and get to the bottom line.

The affidavit goes into the fact that Agent Quo and his other investigative counterparts were able to trace the conduct, essentially, and the genesis of this between the defendant's workplace computer/printer, fax machine as well as his government laptop that had been issued to him when he was a student at USUHS.

And essentially, and again, I won't go into all these details, but as you know, there are myriad ways that Agent Quo found IP addresses that resolve to the defendant on which -- which come back to these many different email accounts, including the particular creation of this document.

And when he turned in that laptop it was clear that he had substantially altered the platform in a way that compromised the ability of someone to see what had been done on that laptop computer.  So the Government has a genuine concern that the defendant will persist in this kind of behavior.

He received a target letter from Mr. Sullivan and myself about ten months ago.  And at that point in time he was actually

represented by not even the FPD but another attorney with whom we had telephonic communications.  We explained what the nature of the Government's suspicions were.  And as you heard from Ms. Leidel, and as is reflected in the affidavit, the conduct persisted.

Even after our meeting with his public defender a couple of weeks ago there was an effort to submit a document that the Government had concluded was a document that had come up in March of this year that essentially was additional conduct trying to essentially perpetrate a fraud.  So hopefully that summarizes, Your Honor.

May I have one minute just to consult with co-counsel?

THE COURT:  Yes.

MR. CUNNINGHAM:  Thanks.

(Discussion off the record.)

MR. CUNNINGHAM:  Judge, Mr. Sullivan pointed out, and I appreciate, that obviously we usually hue to the recommendations of Pretrial; we respect their expertise and such.  And obviously they have recommended something other than this.  But respectfully, we think that one of the things that's not really mentioned in the Pretrial Services report that is so significant, particularly on our basis, is really the obstructive behavior.

It's not surprising, given the length of the affidavit and the time within which they had to assess -- make the assessment

that they had, I'm speculating that they probably hadn't had the opportunity to get that far into the alleged facts and make an assessment as to how that would bear on matters.

THE COURT:  Are you wrapping that into the analysis for threat to public safety?  Threat of safety to the community?  I mean, you're talking about obstructive behavior, potential obstructive behavior.

MR. CUNNINGHAM:  Yes.

THE COURT:  Under the statute usually the consideration is risk of flight, danger to the community.

MR. CUNNINGHAM:  Yes, Your Honor, it is the latter.  The danger is the obstruction, intent to interfere with the process.

THE COURT:  Well, interfere with the process is something that is different than danger to the community.

MR. CUNNINGHAM:  Your Honor, if -- if it says upon motion of the government, and obviously where it says serious risk of personal obstruction or attempt to obstruct justice or threat, injure or intimidate --

THE COURT:  You're in what part of the 3142?

MR. CUNNINGHAM:  That's in F(2), Your Honor.

THE COURT:  Okay.

MR. CUNNINGHAM:  That's essentially why we're harping on that.

THE COURT:  Okay.  Just want to make clear whether

you're using that section or are you talking about danger to the community?

MR. CUNNINGHAM:  No, I understand, Judge, that your determination is based on a question of, you know, reasonable appearance and the safety of other persons in the community.  I understand that that's the decision you will make.

Our proposition is that the reflection of his obstructive behavior, the sophistication of his means and the persistence indicate that he'll continue to present a threat to the community, being largely his ex-wife and children.

THE COURT:  The victims in this case.

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  Okay.  All right.

MR. CUNNINGHAM:  Your Honor, the other thing, and I don't know if you want me to comment on this or not, but I noted in the revision this morning, there's a proposed third party custody of the defendant's parents.  And obviously the Government does not know his parents, and I have no reason to doubt their suitability for third party custody.

But the one thing that I would suggest imposes an impediment to that kind of arrangement, and I don't mean to suggest I'm in any way giving up our argument here that we think detention is appropriate.  But he's an active duty Navy officer serving in a billet in northern Virginia and residing in Scranton, Pennsylvania, a full five hours away from his active

duty billet, seems to be an impossibility.

THE COURT:  Well, that's why I think they also have presented Mr. Corby.

MR. CUNNINGHAM:  Judge, I made this point to Judge Coulson last Thursday.  Mr. Corby is a witness in this case.  It was for Mr. Corby's residence, and I know in the redacted version of the affidavit it might not have been as easily discerned.  We tried to leave first and last name initials in there, but it was from Mr. Corby's residence that Agent Quo was able to actually discern that certain digital communications had originated.  And matters that coincided with the defendant's access to Mr. Corby's presence -- excuse me, his residence at which he had an internet service provider wifi signal.  It is part and parcel of the case here.  So the Government would object to Mr. Corby being identified as an acceptable custodian.

THE COURT:  Okay.  All right.  Thank you, Mr. Cunningham.

And be happy to hear from you, Mr. Proctor.

MR. PROCTOR:  Thank you, Judge.

First of all, the proposed third party custodian, my client's parents, are both here, Judge, in the back right and that is his sister with them.

THE COURT:  Okay.  Good morning.

MR. PROCTOR:  So let's talk about what is not in dispute.  It's not in dispute that he's a veteran.  It's not in

dispute that -- well, it may be in dispute.  According to Google maps, if one was to leave Virginia Beach and drive to Scranton, Pennsylvania it's a seven hour drive.  Maybe if you do it at midnight it's six and a half.  But that's certainly far away from the alleged victims in this case.

It's not disputed that my client has no record.  It's not disputed that he doesn't have any failures to appear, anything like that.  You know, risk of flight really is a stretch here, Judge.  And I'm primarily not going to address that because I don't see anything to refute there.  It's not disputed that his parents are ideal third party custodians.

THE COURT:  What about his father, Mr. Proctor?

MR. PROCTOR:  Say it again.

THE COURT:  I know it's been a long time, but what about his dad?  According to the Pretrial Services Report --

MR. PROCTOR:  It was dismissed, Judge.  And you're right, it was a long time ago.

THE COURT:  Okay.  Well, it says no disposition information was available.  He was charged with simple assault, harassment, and stalking, and criminal mischief in 2002.  No disposition information was available.

MR. PROCTOR:  It was dismissed and expunged that's why you can't find a disposition.  He is not convicted of any crime.

So, you know, and we're not asking for a person that lives in Maryland.  We're not.  We want him to go live in Scranton.

Teleworking is available in his job.  It's not automatic, he has to get out, request, I don't know if they'll say yes, I don't know if they'll say no.  But, you know, if not permitted then he'll have to find another job, it's that simple.  In the interim, living with his parents.

So let's talk about what we need to assure -- and I'm asking for exactly what's in Ms. Cameron's report, nothing less. I'm fine with that.  I've gone through it with my client in the cell block before, he's fine with that.  We're asking for what Pretrial recommends.

This is not a presumption case, Judge.  You know, you see it, I see it, the Government sees it.  I have people all the time that are charged with 922(g)s and get out and don't possess guns anymore.

THE COURT:  Not from me, I can tell you that.  That is not my usual practice, Mr. Proctor.  Although there might have been one exception in my almost seven years on the bench.

MR. PROCTOR:  Okay.  I mean, all of the things the Government points out were not done while Pretrial was supervising him.  And closely supervising at that.  And we're fine with -- I don't purport to understand it, but doesn't really matter if I understand it, it matters that my client does.  We're fine with installing a computer and internet monitoring program.  We're fine with them logging in to see what he's doing and seeing his browsing history.  We're fine to give

him Find my PC or whatever the equipment is these days and let them check it.  We're fine with all of that, Judge.

You know, this case is going to be around for a while.  I imagine, I don't know, and I would have to seek court funding for it, but there would be forensic experts I would suspect to look at who logged in, who did what.  You know, several location checking, that sort of stuff.  Forensic documents examiners.  It's going to be months and months and months.  And so the question is does he languish at CDF for months and months and months or does he go live with his parents in Scranton, Pennsylvania.  That's really the question we're here for.

You know, he has mental health treatment.  Some of the medications it's -- you can take judicial notice if you want, that Chesapeake Detention Facility's not going to give them to him.  He has an appointment on Thursday to pick up a refill of his ADHD medication.  So he's out and he's in the community, he's being properly treated.  We know he has chronic neck pain; again, that's in the report.  Again, CDF treatment for that is to give you Tylenol if you're lucky.  And so if he's in pain you're really putting him in a position where he has restricted access to his lawyers, he has restricted access to the medications he needs to make him better.

And the very fact that he's -- you know, Pretrial only lists the criminal background and history of the defendant.  If they listed the civil it would be -- that report would be twice

as long.  There would be a bunch of litigation, you know, show cause orders and custody fights.  The very fact that he goes to court to seek to redress suggests that he's working within the system not against it, Judge.

You know, the only thing I can see that makes this a remotely close call is the access to computers.  And again, we're fine with agreeing to whatever it is Pretrial wants, including he can get an old-style phone, you know, the flip phone we use to have.  I'm fine with that.  And when he's home the computer he uses there for teleworking or whatever, Pretrial can have as much access to it as they want, including logging in without his knowledge in real-time to see what he's doing.

You know, I mean, domestic terrorism?  That just seems like a stretch.  Divorces are often contentious.  They often don't go well.  There are a panoply of filings on either side.  But it's not an assumption case.  The question is, is he going to come to court.  I didn't hear the Government argue otherwise.  He's come to other courts in Virginia and Maryland and is he going to break the law.

And if we tamper his access to the internet, I don't see how that's even a concern.  I told my client if Judge Copperthite releases you he's going to look you in the eye and he's going to say, if I hear so much as a whisper that there is something going on in your computer you're going to jail and I'm not letting you out next time.  And I expect you to do that and

I expect you to mean it.  But given these circumstances, I just -- I don't see why we don't try to Pretrial way first.

Can I have a moment to consult with Ms. Smith and my client?

THE COURT:  Sure.  Sure.

(Discussion off the record.)

MR. PROCTOR:  Thank you.  That's all I have.

I would suggest that in this case conditions of release can be furnished to assure the safety of the community.

THE COURT:  Thank you, Mr. Proctor.

MR. PROCTOR:  If you have any questions I'll be happy to answer them.

THE COURT:  Thank you, Mr. Proctor.

MR. CUNNINGHAM:  Your Honor, can I address two things there quickly?

THE COURT:  Yes, Mr. Cunningham.

MR. CUNNINGHAM:  And Mr. Proctor is correct, I probably didn't speak to it enough, the issue of flight and why even bring it up.  Because on one hand there isn't evidence and prior failures to appear and so on and so forth.

But I do think -- and it's part of the affidavit, that at this point in time -- actually, you know, Commander Leidel, he's a Navy officer, and he's actually close to eligibility for retirement.  To the extent that now he's facing these charges, it really puts his military status in some jeopardy.  And I

would submit that to the extent that what might have been an impetus to essentially abide by a process and go along, hoping that he might achieve retirement status is now thrown into question, which does raise the issue of, you know, is he going to continue to abide by the rules of the court and show up when and where he's told to do so with the potential that his whole future is going to get turned topsy turvy.

And this dovetails to what I think is, as opposed to Mr. Proctor's contention that he has always shown up and done things, I submit that his conduct reflects a contempt for the legal proceedings and a notion that he can manipulate them through his own use of, you know, computer identities, false identities, false submissions, allegations.

We all know in this day and age what the mere allegation can do to someone's reputation. You see in the affidavit the allegation that he lodged, or the email that he created that purported to come from a Montgomery County Police officer to his boss. Which, if true, would utterly -- should mean that that officer would be dismissed from the police force but also get branded with, you know, racist allegations and stuff. That's the degree to which he's gone to essentially invade the province of the legal process, and why I submit that he's not trustworthy in complying with the Court.

THE COURT: Okay. Thank you, Mr. Cunningham.

MR. PROCTOR: And if I could respond to that. We'll

surrender his passport.  That was one of the conditions.  He ain't going anywhere.  We won't get a new one.  That was one of the conditions.  We're fine with that.

You know, I never get anywhere where arguing the facts of the case.  This time on Friday I had never heard of this man.  I got appointed at the last minute.  You know, Mr. Cunningham says if true.  If true.  That will take months to figure out what's true and what isn't, Your Honor.

THE COURT:  I'm well aware of that, Mr. Proctor.  I don't normally allow surrebuttal but I understand.

MR. PROCTOR:  Thank you.  I don't know that I asked.  I apologize.

THE COURT:  You didn't ask.  But that's okay, Mr. Proctor.  I've taken all of that into consideration.

First of all, Mr. Proctor, I think you've done an extraordinary job trying to -- in representing your client here today and in pointing out what I think were the best arguments that you could possibly have made to have -- persuade the court to follow Pretrial's recommendation in this case.

In accordance with 18 United States Code section 3142, a detention hearing was held and I have determined that after hearing -- reading the affidavit, the extensive affidavit, and hearing from counsel, despite Mr. Proctor's fine argument that he did make, I took all of that into consideration, that after hearing all of that on 3142 the factors require the detention of

the defendant.

Let's first start with the nature and circumstances of the offense charged.  The affidavit here -- all of the police agencies who were involved in this put together an extremely detailed analysis of the defendant's conduct that started after the separation of the defendant and then Mrs. Leidel at the time back in 2018, and followed it through.  And what we saw, although I understand Mr. Proctor's fine points, that often divorces are very contentious, this is not a contentious divorce.  The facts here support, and I find certainly, that at this stage the Government has satisfied their requirements as to proof of the facts here for the purposes of this detention hearing only.  Certainly the facts are sufficient here to support the findings of the stalking that's alleged in this particular case.

But what you have here is an extensive conduct; not only to harass and, in a sense, destroy the victim in this case, Ms. Swensen, and that causes so much collateral damage to the two minor children, but also to subvert the system and to use the criminal justice system and the civil justice system here in the courts to Mr. Leidel's advantage in his attempts to harass Ms. Swensen.

Because some of the allegations and the conduct seem not only to be in the nature of Mr. Leidel obtaining custody possibly of the children and painting Ms. Swenson in a bad

light, but it goes deeper than that.  It is a serious threat to the victims in this case and that is Ms. Swenson and the children.  I think whether that threat could be by brandishing a firearm or whether that threat can be by use of the computer, it certainly caused extreme damage to Ms. Swensen and these two minor victims.

As Ms. Swensen pointed out, the contact was all the way up until the defendant was arrested.  And now there was some contact that was certainly allowed through the court system because of dealing with the custody issues with the children.  So I'm not saying that Mr. Leidel wasn't able to contact, but what I am saying is the nature of the contact and the conduct here is just -- it's beyond outrageous.  It takes a long reading of that affidavit, but I credit the law enforcement agencies for producing so much detail that I think is very certainly convincing to this Court at this stage of the nature and the circumstances.

So the nature and circumstances here, I think, certainly command the detention of the defendant.  It does affect and involve the minor victim as section (g)(1) points out.

The weight of the evidence here against Mr. Leidel is extremely strong.  The FBI as well as the other law enforcement agencies who were involved with this multi-jurisdictional matter certainly took careful time to evaluate this evidence and to follow the evidence as they layout in the affidavit.

The history and characteristics of the person.  I certainly credit the fact that he is a veteran.  I certainly credit that he has achieved a certain rank.  But it appears to me that he has used that position to further the scheme that he has gotten himself and his co-defendant involved in in harassing these victims.

So his history and characteristics here, while he has no criminal record, that doesn't give the victims here any comfort. Because obviously they're looking over their shoulder every day to see whether there's something else that's coming down.  Or, you know, the use of another police agency to come and arrest her for false charges.  It was endless during this time period and it was brutal.

And the history -- excuse me, whether -- the nature and seriousness of the danger to any person here I think, is -- it's clear that we have a -- we have victims in the community who are threatened.  Whether that's by cyber threatening, certainly Mr. Leidel has great knowledge of the use of computers.  And I have absolutely no confidence that placing him in a home and saying you can't use computers, or that the computers there are going to be monitored, somehow or another he would end up -- I have no confidence he would not obtain access to a computer or somehow or another be able to continue this constant threat against the victims that he has engaged in.

And it appears initially there were -- there was

threatening emails and some fraudulent emails, but that seems to escalate over that period of time which causes the fear in the victim and her children to escalate accordingly.

So I think that it's clear that not only is there danger to the victims in this case, including minor victims, but also a danger to the whole system. I mean, Mr. Leidel, according to these facts, manipulated the court system to use the court system as a weapon to certainly continue to terrorize the victims in this case. So I find that all of these factors require the detention of the defendant and I will enter an order accordingly.

Mr. Proctor, you stated that the defendant was on certain medications. Do you know if there is a medical order in place?

MR. PROCTOR: I do not, Judge, because the Federal Public Defender represented him. But even if there is --

THE COURT: You have one?

MR. PROCTOR: -- I have an updated one.

May I approach?

THE COURT: Certainly. Provide that to our courtroom deputy.

I'm going to mark this as an urgent medication issue and mental health issue.

I made a note here marking urgent medication and mental health issues. Please evaluate and ensure medications and mental health issues are addressed and addressed promptly.

And Mr. Proctor, you'll let me know if that's not done.

MR. PROCTOR:  Yes, sir.

THE COURT:  And let me just -- once again, Mr. Proctor, I feel like I'm doing this every day, which I am.  Let me thank you again for accepting this appointment on such short notice.

MR. PROCTOR:  Yes, sir.

THE COURT:  As well as Ms. Smith.  Ms. Smith, welcome to you as well.

Anything further, Mr. Cunningham?

MR. CUNNINGHAM:  Yes, Your Honor.  Can we at this time schedule a preliminary hearing for noon on Thursday the 3rd of November, which is 14 days from when the --

THE COURT:  Does that work for you, Mr. Proctor?

MR. PROCTOR:  Can I just have a moment to consult with my client?

THE COURT:  Sure.

(Discussion held off the record.)

MR. PROCTOR:  Thursday the 3rd at noon, Your Honor?

THE COURT:  Yes.  Set this in for preliminary hearing for Thursday, November the 3rd at 12:30 p.m.

MR. PROCTOR:  That works for me.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  Then we will stand in recess.

(The proceedings concluded at 11:29 a.m.)


FTR CERTIFICATE

I, Kassandra L. McPherson, RPR, do hereby certify that the foregoing is a correct transcript of the audio-recorded proceedings in the above-entitled matter, audio recorded via FTR Gold on 10/24/2022, and transcribed from the audio recording to the best of my ability and that said transcript has been compared with the audio recording.


Dated this 19th day of May 2025.

-/s/
_____
Kassandra L. McPherson, RPR
Federal Official Court Reporter

1

**/**

/s [1] - 32:10

**1**

1 [1] - 4:6
10/24/2022 [1] - 32:6
101 [1] - 1:24
10:42 [1] - 2:1
11:29 [1] - 32:2
12 [1] - 6:9
12:30 [1] - 31:21
13 [1] - 6:9
14 [1] - 31:13
15th [1] - 12:25
18 [2] - 5:6, 26:20
19th [1] - 32:9

**2**

2 [1] - 4:7
2002 [1] - 20:20
2005 [1] - 6:15
2018 [5] - 4:12, 6:12, 6:24, 7:14, 27:7
2019 [1] - 13:2
2022 [1] - 1:7
2025 [1] - 32:9
21201 [2] - 1:15, 1:24
21202 [1] - 1:19
21st [1] - 3:14
22-MJ-03965 [1] - 2:14
2263 [2] - 5:8, 5:9
233 [1] - 1:18
24 [1] - 1:7

**3**

30 [1] - 7:10
3142 [3] - 17:20, 26:20, 26:25
3142(g) [1] - 11:25
31st [1] - 7:13
36 [1] - 1:14
3rd [3] - 31:12, 31:19, 31:21

**4**

410 [1] - 1:25
4th [2] - 1:14, 1:24

**7**

7B [1] - 1:8

**8**

86 [1] - 4:21
86th [1] - 14:13

**9**

90 [3] - 4:21, 4:22, 11:23
922(g)s [1] - 21:13
962-4544 [1] - 1:25

**A**

a.m [2] - 2:1, 32:2
abide [2] - 25:2, 25:5
ability [3] - 15:6, 15:21, 32:7
able [6] - 15:3, 15:5, 15:9, 19:10, 28:11, 29:23
abortion [3] - 12:12, 12:13, 12:16
above-entitled [1] - 32:6
absolutely [1] - 29:19
abusive [1] - 9:2
accept [1] - 2:23
acceptable [1] - 19:15
accepting [1] - 31:5
access [8] - 9:19, 19:12, 22:21, 23:6, 23:11, 23:20, 29:22
accompany [1] - 7:3
accordance [1] - 26:20
according [3] - 20:1, 20:15, 30:6
accordingly [2] - 30:3, 30:11
account [1] - 12:9
accounts [1] - 15:17
achieve [1] - 25:3
achieved [1] -

29:3
active [3] - 14:16, 18:23, 18:25
add [3] - 4:16, 4:17, 10:21
addendum [1] - 3:13
addition [1] - 11:16
additional [1] - 16:9
address [2] - 20:9, 24:14
addressed [2] - 30:25
addresses [1] - 15:16
ADHD [1] - 22:16
advantage [1] - 27:21
affect [1] - 28:19
affidavit [23] - 3:2, 3:22, 4:1, 4:15, 4:18, 4:24, 6:16, 8:10, 11:18, 11:21, 12:2, 14:21, 15:8, 16:4, 16:24, 19:7, 24:21, 25:15, 26:22, 27:3, 28:14, 28:25
age [1] - 25:14
agencies [3] - 27:4, 28:14, 28:23
agency [1] - 29:11
Agent [6] - 2:16, 5:15, 14:19, 15:8, 15:15, 19:9
ago [3] - 15:25, 16:7, 20:17
agreeing [1] - 23:7
Aided [1] - 1:22
ain't [1] - 26:2
Air [2] - 14:15, 14:17
allegation [3] - 11:4, 25:14, 25:16
allegations [5] - 4:23, 13:14, 25:13, 25:20, 27:23
alleged [3] - 17:2, 20:5, 27:14
allegedly [2] - 12:11, 14:17

allow [1] - 26:10
allowed [2] - 7:21, 28:9
allowing [1] - 11:11
almost [1] - 21:17
altered [1] - 15:20
AMERICA [1] - 1:4
analysis [2] - 17:4, 27:5
anonymous [1] - 12:8
answer [1] - 24:12
anticipation [1] - 3:21
apologize [3] - 2:25, 13:1, 26:12
app [1] - 10:6
appear [2] - 20:7, 24:20
appearance [2] - 2:24, 18:5
appoint [1] - 3:6
appointed [3] - 2:22, 14:7, 26:6
appointment [3] - 2:23, 22:15, 31:5
appreciate [2] - 13:17, 16:17
approach [2] - 12:7, 30:18
appropriate [1] - 18:23
area [3] - 7:1, 8:3, 13:23
argue [1] - 23:17
arguing [1] - 26:4
argument [3] - 4:17, 18:22, 26:23
arguments [1] - 26:17
arrangement [1] - 18:21
arrest [3] - 10:3, 10:4, 29:11
arrested [3] - 9:25, 10:1, 28:8
ascribing [1] - 12:15
aspect [1] - 14:1
assault [1] - 20:19
assess [2] - 14:8, 16:25
assessment [2] - 16:25, 17:3
assigned [2] -

6:25, 14:16
assignment [2] - 7:6, 8:6
assumption [1] - 23:16
assure [2] - 21:6, 24:9
attacking [1] - 12:7
attempt [1] - 17:18
attempted [2] - 7:20, 12:19
attempts [1] - 27:21
Attorney [1] - 1:14
attorney [1] - 16:1
Audio [1] - 1:21
audio [4] - 32:5, 32:6, 32:6, 32:7
audio-recorded [1] - 32:5
automatic [1] - 21:1
available [3] - 20:19, 20:21, 21:1
aware [1] - 26:9

**B**

background [2] - 6:21, 22:24
bad [1] - 27:25
Baltimore [4] - 1:8, 1:15, 1:19, 1:24
base [1] - 14:15
based [1] - 18:4
basis [2] - 4:4, 16:22
Beach [3] - 8:3, 13:22, 20:2
bear [1] - 17:3
bears [1] - 11:19
BEFORE [1] - 1:10
beginning [1] - 6:12
Behalf [2] - 1:12, 1:16
behavior [8] - 4:10, 12:20, 14:3, 15:23, 16:23, 17:6, 17:7, 18:8
bench [1] - 21:17
best [2] - 26:17, 32:7

better [1] - 22:22
between [1] - 15:10
beyond [1] - 28:13
billet [2] - 18:24, 19:1
block [1] - 21:9
boss [1] - 25:18
bottom [1] - 15:7
branded [1] - 25:20
brandishing [1] - 28:3
break [1] - 23:19
briefly [1] - 12:1
bring [1] - 24:19
browsing [1] - 21:25
brutal [1] - 29:13
bunch [1] - 23:1
BY [3] - 6:1, 6:23, 8:21

**C**

Cameron's [1] - 21:7
capable [2] - 9:17, 14:2
capacity [1] - 14:8
careful [1] - 28:24
CASE [1] - 1:5
case [20] - 2:5, 2:13, 2:22, 3:3, 11:20, 18:11, 19:5, 19:14, 20:5, 21:11, 22:3, 23:16, 24:8, 26:5, 26:19, 27:15, 27:17, 28:2, 30:5, 30:9
caused [2] - 12:12, 28:5
causes [2] - 27:18, 30:2
CDF [2] - 22:9, 22:18
cell [1] - 21:9
certain [3] - 19:10, 29:3, 30:12
certainly [17] - 5:2, 5:4, 5:13, 13:18, 20:4, 27:10, 27:13, 28:5, 28:9, 28:15, 28:18, 28:24, 29:1,

29:2, 29:17, 30:8, 30:19
**CERTIFICATE** [1] - 32:4
**certify** [1] - 32:5
**challenging** [1] - 7:23
**chambers** [1] - 3:20
**characteristics** [2] - 29:1, 29:7
**charged** [3] - 20:19, 21:13, 27:3
**charges** [3] - 4:3, 24:24, 29:12
**Charles** [1] - 1:14
**check** [1] - 22:2
**checking** [1] - 22:7
**Chesapeake** [1] - 22:14
**child** [1] - 14:6
**children** [12] - 8:8, 9:20, 10:7, 10:15, 10:16, 13:22, 18:10, 27:19, 27:25, 28:3, 28:10, 30:3
**chronic** [1] - 22:17
**circumstances** [4] - 24:1, 27:2, 28:17, 28:18
**civil** [3] - 10:11, 22:25, 27:20
**clear** [5] - 11:3, 15:19, 17:25, 29:16, 30:4
**clearly** [1] - 6:3
**CLERK** [2] - 5:22, 5:24
**client** [7] - 20:6, 21:8, 21:22, 23:21, 24:4, 26:16, 31:16
**client's** [1] - 19:21
**clinic** [1] - 12:12
**close** [5] - 4:21, 4:22, 11:23, 23:6, 24:23
**closely** [1] - 21:20
**co** [3] - 12:23, 16:12, 29:5
**co-counsel** [1] - 16:12
**co-defendant** [2] - 12:23, 29:5
**Code** [1] - 26:20

**coincided** [1] - 19:11
**collateral** [1] - 27:18
**collusion** [1] - 13:4
**comfort** [1] - 29:8
**coming** [2] - 8:5, 29:10
**command** [1] - 28:19
**Commander** [1] - 24:22
**comment** [1] - 18:15
**communication** s [2] - 16:2, 19:10
**community** [9] - 17:5, 17:10, 17:15, 18:2, 18:5, 18:10, 22:16, 24:9, 29:16
**compared** [1] - 32:7
**complaint** [1] - 3:21
**complying** [1] - 25:23
**compromised** [1] - 15:20
**Computer** [1] - 1:22
**computer** [7] - 15:22, 21:23, 23:10, 23:24, 25:12, 28:4, 29:22
**Computer-Aided** [1] - 1:22
**computer/ printer** [1] - 15:11
**computers** [5] - 9:18, 23:6, 29:18, 29:20
**concern** [2] - 15:22, 23:21
**concluded** [2] - 16:8, 32:2
**conditions** [3] - 24:8, 26:1, 26:3
**conduct** [8] - 15:9, 16:4, 16:9, 25:10, 27:5, 27:16, 27:23, 28:12
**confidence** [2] - 29:19, 29:22

**conflict** [1] - 2:22
**consideration** [4] - 11:24, 17:10, 26:14, 26:24
**constant** [2] - 9:4, 29:23
**constantly** [1] - 9:13
**consult** [3] - 16:12, 24:3, 31:15
**contact** [9] - 9:25, 10:4, 10:14, 10:17, 28:7, 28:9, 28:11, 28:12
**contacts** [1] - 10:5
**contempt** [1] - 25:10
**contend** [1] - 11:19
**contention** [3] - 4:4, 13:16, 25:9
**contentious** [3] - 23:14, 27:9
**context** [3] - 4:17, 11:5, 12:16
**continue** [6] - 4:9, 9:18, 18:9, 25:5, 29:23, 30:8
**continued** [2] - 9:2, 9:10
**continues** [1] - 10:12
**convicted** [1] - 20:23
**convincing** [1] - 28:16
**copied** [1] - 3:23
**COPPERTHITE** [1] - 1:10
**Copperthite** [2] - 2:6, 23:22
**copy** [1] - 3:21
**Corby** [3] - 19:3, 19:5, 19:15
**Corby's** [3] - 19:6, 19:9, 19:12
**corner** [1] - 9:13
**correct** [3] - 6:6, 24:17, 32:5
**Coulson** [1] - 19:5
**counsel** [4] - 2:8, 2:16, 16:12, 26:23
**counterparts** [1] - 15:9
**County** [3] - 13:7, 13:13, 25:17

**couple** [1] - 16:6
**course** [4] - 4:2, 9:11, 14:5, 14:21
**Court** [5] - 1:23, 5:10, 25:23, 28:16, 32:11
**court** [11] - 10:7, 13:6, 14:7, 22:4, 23:3, 23:17, 25:5, 26:18, 28:9, 30:7
**COURT** [64] - 1:1, 2:3, 2:8, 2:18, 3:2, 3:6, 3:8, 3:13, 3:17, 4:18, 4:22, 5:2, 5:8, 5:13, 5:17, 5:20, 6:20, 8:9, 8:12, 8:14, 9:24, 10:2, 10:5, 10:8, 10:14, 10:18, 10:23, 11:1, 11:7, 11:9, 11:14, 11:21, 16:13, 17:4, 17:9, 17:14, 17:20, 17:22, 17:25, 18:11, 18:13, 19:2, 19:16, 19:23, 20:12, 20:14, 20:18, 21:15, 24:5, 24:10, 24:13, 24:16, 25:24, 26:9, 26:13, 30:16, 30:19, 31:3, 31:8, 31:14, 31:17, 31:20, 31:24, 32:1
**courtroom** [2] - 6:4, 30:19
**Courtroom** [1] - 1:8
**courts** [3] - 13:7, 23:18, 27:21
**crafted** [1] - 13:19
**created** [1] - 25:16
**creating** [1] - 12:9
**creation** [1] - 15:18
**credit** [4] - 15:1, 28:14, 29:2
**crime** [1] - 20:23
**Criminal** [1] - 2:14
**CRIMINAL** [1] - 1:5
**criminal** [6] -

13:6, 13:14, 20:20, 22:24, 27:20, 29:8
**cross** [1] - 11:5
**cross-examine** [1] - 11:5
**CUNNINGHAM** [39] - 1:13, 2:6, 2:12, 3:4, 3:12, 3:16, 3:19, 4:21, 5:1, 5:4, 5:9, 5:16, 5:18, 5:25, 6:1, 6:23, 8:11, 8:13, 8:21, 10:24, 11:3, 11:17, 12:1, 16:14, 16:16, 17:8, 17:11, 17:16, 17:21, 17:23, 18:3, 18:12, 18:14, 19:4, 24:14, 24:17, 31:11, 31:23, 31:25
**Cunningham** [12] - 2:5, 2:14, 8:9, 10:19, 10:23, 11:15, 11:22, 19:17, 24:16, 25:24, 26:6, 31:10
**custodial** [2] - 14:9
**custodian** [2] - 19:15, 19:20
**custodians** [1] - 20:11
**custody** [7] - 10:12, 14:6, 18:17, 18:19, 23:2, 27:24, 28:10
**cyber** [1] - 29:17

## D

**D.C** [1] - 6:25
**dad** [1] - 20:15
**damage** [2] - 27:18, 28:5
**danger** [7] - 17:10, 17:12, 17:15, 18:1, 29:15, 30:4, 30:6
**date** [1] - 13:1
**dated** [1] - 3:13
**Dated** [1] - 32:9
**daughter** [1] - 9:8
**daughters'** [1] -

9:4
**DAVID** [1] - 1:10
**days** [3] - 7:10, 22:1, 31:13
**dealing** [1] - 28:10
**decision** [3] - 8:16, 15:2, 18:6
**decision-making** [1] - 15:2
**deeper** [1] - 28:1
**defendant** [19] - 4:8, 6:5, 12:23, 13:4, 13:20, 14:2, 14:16, 14:25, 15:5, 15:16, 15:23, 22:24, 27:1, 27:6, 28:8, 28:19, 29:5, 30:10, 30:12
**Defendant** [1] - 1:16
**defendant's** [5] - 5:6, 15:10, 18:17, 19:11, 27:5
**defender** [1] - 16:6
**Defender** [3] - 2:21, 3:5, 30:15
**degree** [4] - 13:4, 14:2, 15:4, 25:21
**demand** [1] - 13:12
**denied** [1] - 14:21
**deputy** [1] - 30:20
**despite** [1] - 26:23
**destroy** [1] - 27:17
**detail** [2] - 6:17, 28:15
**detailed** [2] - 11:23, 27:5
**details** [1] - 15:15
**detain** [1] - 8:16
**detained** [1] - 8:19
**detention** [9] - 2:17, 4:5, 11:19, 18:23, 26:21, 26:25, 27:12, 28:19, 30:10
**DETENTION** [1] - 1:9
**Detention** [1] - 22:14
**determination** [1]

- 18:4
**determine** [1] - 15:6
**determined** [1] - 26:21
**different** [4] - 13:15, 14:17, 15:17, 17:15
**difficult** [1] - 9:22
**digital** [1] - 19:10
**direct** [1] - 6:18
**directly** [1] - 10:15
**discern** [1] - 19:10
**discerned** [1] - 19:8
**discussion** [4] - 11:10, 16:15, 24:6, 31:18
**dismissed** [3] - 20:16, 20:22, 25:19
**disposition** [3] - 20:18, 20:21, 20:23
**dispute** [4] - 19:25, 20:1
**disputed** [3] - 20:6, 20:7, 20:10
**dissemination** [1] - 12:17
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [1] - 1:2
**divorce** [3] - 6:9, 7:16, 27:10
**divorces** [2] - 23:14, 27:9
**Docket** [1] - 2:14
**document** [6] - 13:19, 14:11, 14:25, 15:18, 16:7, 16:8
**documents** [1] - 22:7
**domestic** [4] - 12:4, 13:6, 14:6, 23:13
**done** [5] - 15:21, 21:19, 25:9, 26:15, 31:1
**doubt** [1] - 18:19
**dovetails** [1] - 25:8
**down** [2] - 14:8, 29:10
**drive** [2] - 20:2, 20:3

**duly** [1] - 5:21
**during** [2] - 4:2, 29:12
**duty** [3] - 14:16, 18:23, 19:1

**E**

**easily** [1] - 19:7
**East** [1] - 1:18
**effort** [1] - 16:7
**either** [4] - 9:2, 11:12, 11:13, 23:15
**eligibility** [1] - 24:23
**email** [4] - 12:9, 12:13, 15:17, 25:16
**emails** [4] - 9:7, 12:8, 30:1
**emotional** [2] - 9:4, 9:9
**employment** [1] - 12:19
**end** [2] - 3:1, 29:21
**endless** [1] - 29:12
**enforcement** [2] - 28:14, 28:22
**engage** [2] - 12:6, 14:2
**engaged** [1] - 29:24
**ensure** [1] - 30:24
**enter** [1] - 30:10
**entered** [1] - 2:24
**entitled** [1] - 32:6
**equipment** [1] - 22:1
**Erica** [3] - 12:22, 13:12, 14:11
**ERICA** [1] - 5:21
**erica** [1] - 5:23
**escalate** [5] - 9:10, 9:11, 30:2, 30:3
**ESQUIRE** [4] - 1:13, 1:13, 1:17, 1:17
**essence** [1] - 13:16
**essentially** [17] - 4:1, 4:11, 6:11, 7:11, 12:2, 12:3, 12:6, 12:15, 13:5, 14:19, 15:10, 15:14, 16:9, 16:10,

17:23, 25:2, 25:21
**Essex** [1] - 2:23
**evaluate** [2] - 28:24, 30:24
**evidence** [6] - 4:2, 13:18, 24:19, 28:21, 28:24, 28:25
**ex** [3] - 4:12, 5:6, 18:10
**ex-wife** [3] - 4:12, 5:6, 18:10
**exactly** [1] - 21:7
**examination** [1] - 6:19
**examine** [1] - 11:5
**examiners** [1] - 22:7
**exception** [1] - 21:17
**excuse** [2] - 19:12, 29:14
**exist** [1] - 9:16
**expect** [2] - 23:25, 24:1
**expediency** [1] - 3:24
**expedite** [1] - 3:24
**expertise** [1] - 16:18
**experts** [1] - 22:5
**explained** [1] - 16:2
**expunged** [1] - 20:22
**extensive** [4] - 4:19, 11:22, 26:22, 27:16
**extent** [2] - 24:24, 25:1
**extortion** [5] - 12:22, 12:24, 13:8, 13:9, 13:11
**extra** [1] - 12:11
**extra-marital** [1] - 12:11
**extract** [1] - 14:11
**extraordinary** [1] - 26:16
**extreme** [1] - 28:5
**extremely** [2] - 27:4, 28:22
**eye** [1] - 23:22

**F**

**F(2** [1] - 17:21

**faceted** [1] - 12:6
**Facility's** [1] - 22:14
**facing** [1] - 24:24
**fact** [6] - 13:18, 13:23, 15:8, 22:23, 23:2, 29:2
**factors** [3] - 11:24, 26:25, 30:9
**facts** [11] - 4:24, 5:3, 11:23, 11:24, 15:7, 17:2, 26:4, 27:10, 27:12, 27:13, 30:7
**failures** [2] - 20:7, 24:20
**fairly** [1] - 11:22
**false** [4] - 9:7, 25:12, 25:13, 29:12
**falsified** [1] - 14:3
**familiar** [1] - 4:23
**far** [2] - 17:2, 20:4
**father** [1] - 20:12
**fax** [1] - 15:11
**FBI** [2] - 2:16, 28:22
**fear** [3] - 9:4, 9:22, 30:2
**Federal** [5] - 1:23, 2:21, 3:5, 30:14, 32:11
**felt** [1] - 3:23
**fights** [1] - 23:2
**figure** [1] - 26:7
**filed** [1] - 3:3
**filings** [1] - 23:15
**financial** [1] - 3:2
**findings** [2] - 13:18, 27:14
**fine** [14] - 2:9, 2:11, 21:8, 21:9, 21:21, 21:23, 21:24, 21:25, 22:2, 23:7, 23:9, 26:3, 26:23, 27:8
**firearm** [1] - 28:4
**first** [7] - 4:14, 7:19, 19:8, 19:20, 24:2, 26:15, 27:2
**five** [1] - 18:25
**flight** [4] - 4:6, 17:10, 20:8, 24:18
**flip** [1] - 23:8

**Floor** [2] - 1:14, 1:24
**follow** [2] - 26:19, 28:25
**followed** [1] - 27:7
**FOR** [1] - 1:2
**Force** [2] - 14:15, 14:17
**force** [1] - 25:19
**foregoing** [1] - 32:5
**forensic** [2] - 22:5, 22:7
**former** [1] - 6:5
**forms** [1] - 4:3
**forth** [2] - 13:14, 24:20
**four** [3] - 4:11, 9:11, 12:3
**four-year** [1] - 12:3
**FPD** [1] - 16:1
**fraud** [3] - 13:5, 15:6, 16:10
**fraudulent** [1] - 30:1
**Friday** [2] - 3:20, 26:5
**FTR** [2] - 32:4, 32:6
**full** [1] - 18:25
**funding** [1] - 22:4
**furnished** [1] - 24:9
**future** [1] - 25:7

**G**

**g)(1** [1] - 28:20
**gallery** [1] - 11:2
**GARY** [1] - 1:17
**Gary** [2] - 1:18, 2:20
**gathered** [1] - 4:2
**generated** [1] - 14:13
**genesis** [1] - 15:10
**genuine** [1] - 15:22
**given** [2] - 16:24, 24:1
**Gold** [1] - 32:6
**Google** [1] - 20:1
**Government** [11] - 4:16, 4:24, 13:8, 15:22, 16:8, 18:18, 19:14, 21:12,

21:19, 23:17, 27:11
**government** [2] - 15:12, 17:17
**Government's** [4] - 4:4, 4:8, 13:16, 16:3
**great** [1] - 29:18
**Group** [1] - 14:14
**guess** [1] - 4:14
**guns** [1] - 21:14

**H**

**half** [1] - 20:4
**hand** [2] - 13:1, 24:19
**happy** [4] - 4:13, 5:13, 19:18, 24:11
**harass** [2] - 27:17, 27:21
**harassing** [1] - 29:5
**harassment** [3] - 9:2, 10:13, 20:20
**harping** [1] - 17:23
**health** [7] - 14:12, 14:18, 14:23, 22:12, 30:22, 30:24, 30:25
**Health** [1] - 7:7
**hear** [6] - 5:13, 8:17, 8:19, 19:18, 23:17, 23:23
**heard** [2] - 16:3, 26:5
**HEARING** [1] - 1:9
**hearing** [8] - 2:17, 26:21, 26:22, 26:23, 26:25, 27:13, 31:12, 31:20
**held** [2] - 26:21, 31:18
**help** [2] - 9:22
**hereby** [1] - 32:5
**hideous** [1] - 12:14
**highlight** [1] - 12:21
**himself** [1] - 29:5
**history** [6] - 4:11, 21:25, 22:24, 29:1, 29:7, 29:14

home [2] - 23:9, 29:19
Honor [23] - 2:12, 2:20, 3:4, 3:12, 3:19, 4:13, 5:11, 6:18, 9:1, 10:22, 10:24, 16:11, 17:11, 17:16, 17:21, 18:12, 18:14, 24:14, 26:8, 31:11, 31:19, 31:23, 31:25
HONORABLE [1] - 1:10
hopefully [2] - 3:24, 16:10
hoping [1] - 25:2
hotel [1] - 13:23
hour [1] - 20:3
hours [1] - 18:25
house [1] - 9:6
hue [1] - 16:17
husband [1] - 6:24

**I**

ideal [1] - 20:11
identified [2] - 6:5, 19:15
identifies [1] - 4:1
identities [2] - 25:12, 25:13
imagine [1] - 22:4
immediately [1] - 13:1
impact [1] - 15:3
impediment [1] - 18:21
impetus [1] - 25:2
imposes [1] - 18:20
impossibility [1] - 19:1
IN [1] - 1:1
in-residence [1] - 9:8
including [4] - 15:18, 23:8, 23:11, 30:5
indicate [1] - 18:9
indicated [4] - 5:5, 7:15, 11:22, 14:21
indicating [1] - 13:24
inflict [1] - 12:3
information [2] - 20:19, 20:21

initials [1] - 19:8
initiate [1] - 7:12
injure [1] - 17:19
installing [1] - 21:23
intended [1] - 7:15
intent [1] - 17:12
interfere [2] - 17:12, 17:14
interfered [1] - 12:9
interference [2] - 12:18, 12:19
interim [1] - 21:5
internet [3] - 19:13, 21:23, 23:20
intimidate [1] - 17:19
intimidation [1] - 4:10
invade [1] - 25:21
investigation [1] - 4:3
investigative [1] - 15:9
involve [1] - 28:20
involved [3] - 27:4, 28:23, 29:5
involving [1] - 14:6
IP [1] - 15:16
issue [5] - 14:3, 24:18, 25:4, 30:21, 30:22
issued [1] - 15:12
issues [3] - 28:10, 30:24, 30:25

**J**

jail [1] - 23:24
JASON [1] - 1:6
Jason [2] - 2:13, 6:5
JENNIFER [1] - 1:17
Jennifer [1] - 2:21
jeopardy [2] - 9:7, 24:25
job [3] - 21:1, 21:4, 26:16
job's [1] - 9:7
judge [4] - 3:20, 11:3, 16:16, 19:4
Judge [18] - 1:10, 2:6, 5:5, 11:8,

11:18, 12:1, 14:4, 18:3, 19:4, 19:19, 19:21, 20:9, 20:16, 21:11, 22:2, 23:4, 23:21, 30:14
Judge's [1] - 8:22
judicial [1] - 22:13
July [1] - 7:13
juncture [1] - 13:17
jurisdictional [1] - 28:23
justice [3] - 17:18, 27:20

**K**

Kassandra [3] - 1:23, 32:5, 32:11
keep [1] - 9:6
Kevin [1] - 2:17
keys [1] - 7:20
kind [5] - 12:14, 14:22, 14:23, 15:23, 18:21
knowledge [2] - 23:12, 29:18
known [1] - 13:21

**L**

laid [1] - 6:16
language [1] - 12:13
languish [1] - 22:9
laptop [3] - 15:12, 15:19, 15:21
largely [1] - 18:10
larger [1] - 7:22
last [4] - 13:10, 19:5, 19:8, 26:6
latter [1] - 17:11
Law [1] - 1:18
law [3] - 23:19, 28:14, 28:22
lawyers [1] - 22:21
layout [1] - 28:25
lays [1] - 12:2
least [3] - 4:16, 13:9, 14:22
leave [5] - 7:20, 7:23, 7:25, 19:8, 20:2
left [1] - 7:13
legal [3] - 9:3,

25:11, 25:22
LEIDEL [1] - 1:6
Leidel [22] - 2:13, 5:14, 6:6, 6:8, 7:15, 8:16, 12:7, 12:22, 12:23, 13:12, 13:22, 14:10, 14:18, 14:20, 16:4, 24:22, 27:6, 27:24, 28:11, 28:21, 29:18, 30:6
Leidel's [2] - 14:12, 27:21
lend [1] - 3:24
length [1] - 16:24
lengthy [1] - 4:1
less [1] - 21:7
letter [6] - 12:22, 12:24, 13:8, 13:9, 13:11, 15:24
letting [1] - 23:25
level [1] - 9:15
light [1] - 28:1
lightly [1] - 12:4
line [1] - 15:7
listed [1] - 22:25
lists [1] - 22:24
litigation [2] - 14:6, 23:1
live [2] - 20:25, 22:10
lives [1] - 20:24
living [1] - 21:5
LKG-22-380 [1] - 1:5
located [1] - 8:5
location [1] - 22:6
locking [1] - 7:23
lodged [1] - 25:16
logged [1] - 22:6
logging [2] - 21:24, 23:11
Lombard [1] - 1:24
look [4] - 9:13, 11:24, 22:6, 23:22
looking [1] - 29:9
loudly [1] - 6:3
lucky [1] - 22:19

**M**

ma'am [1] - 11:1
machine [1] - 15:11
Magistrate [1] -

1:10
mailed [2] - 13:19, 13:20
maintain [1] - 9:9
man [2] - 12:10, 26:5
manipulate [1] - 25:11
manipulated [1] - 30:7
maps [1] - 20:2
March [1] - 16:9
marital [1] - 12:11
mark [1] - 30:21
marking [1] - 30:23
married [3] - 6:8, 6:14, 6:15
MARYLAND [1] - 1:2
Maryland [3] - 1:8, 20:25, 23:18
mask [3] - 2:7, 2:9, 5:18
matter [3] - 21:22, 28:23, 32:6
matters [3] - 17:3, 19:11, 21:22
McPherson [3] - 1:23, 32:5, 32:11
MD [3] - 1:15, 1:19, 1:24
mean [8] - 12:14, 17:6, 18:21, 21:18, 23:13, 24:1, 25:18, 30:6
means [4] - 9:2, 9:3, 10:13, 18:8
medical [7] - 14:3, 14:7, 14:10, 14:13, 14:15, 14:24, 30:13
Medical [1] - 14:14
medication [3] - 22:16, 30:21, 30:23
medications [4] - 22:13, 22:22, 30:13, 30:24
meeting [2] - 13:24, 16:6
mental [7] - 14:12, 14:18, 14:23, 22:12, 30:22, 30:23, 30:25

mentioned [2] - 12:18, 16:21
mere [1] - 25:14
merits [1] - 11:18
Michael [1] - 2:14
MICHAEL [2] - 1:6, 1:13
microphone [1] - 5:17
midnight [1] - 20:4
might [4] - 19:7, 21:16, 25:1, 25:3
military [2] - 6:25, 24:25
mind [1] - 12:5
minds [1] - 13:24
minor [4] - 27:19, 28:6, 28:20, 30:5
minute [2] - 16:12, 26:6
mischief [1] - 20:20
moment [3] - 11:8, 24:3, 31:15
Monday [2] - 1:7, 10:4
monitored [1] - 29:21
monitoring [1] - 21:24
Montgomery [3] - 13:7, 13:13, 25:17
months [8] - 15:25, 22:8, 22:9, 22:10, 26:7
morning [6] - 2:3, 2:6, 2:17, 3:9, 18:16, 19:23
most [1] - 10:3
motion [2] - 10:11, 17:17
multi [2] - 12:6, 28:23
multi-faceted [1] - 12:6
multi-jurisdictional [1] - 28:23
myriad [1] - 15:15

**N**

N-word [1] - 12:14
name [2] - 5:22,

19:8
**nature** [8] - 12:20, 16:2, 27:2, 27:24, 28:12, 28:16, 28:18, 29:14
**Navy** [2] - 18:23, 24:23
**necessary** [1] - 14:4
**neck** [1] - 22:17
**need** [1] - 21:6
**needs** [1] - 22:22
**never** [2] - 26:4, 26:5
**new** [2] - 7:5, 26:2
**next** [2] - 9:12, 23:25
**NO** [1] - 1:5
**noon** [2] - 31:12, 31:19
**normalcy** [1] - 9:5
**normally** [1] - 26:10
**northern** [1] - 18:24
**NORTHERN** [1] - 1:2
**note** [1] - 30:23
**noted** [1] - 18:15
**nothing** [2] - 11:17, 21:7
**notice** [2] - 22:13, 31:6
**notion** [1] - 25:11
**November** [2] - 31:13, 31:21
**Number** [1] - 2:14

**O**

**oath** [1] - 5:19
**object** [2] - 6:18, 19:15
**obstruct** [2] - 15:6, 17:18
**obstruction** [2] - 17:12, 17:18
**obstructive** [7] - 4:9, 12:20, 14:3, 16:23, 17:6, 17:7, 18:7
**obtain** [1] - 29:22
**obtaining** [1] - 27:24
**obviously** [9] - 11:18, 12:18, 13:10, 13:17, 16:17, 16:19, 17:17, 18:17,

29:9
**October** [2] - 1:7, 3:13
**OF** [2] - 1:2, 1:4
**offense** [1] - 27:3
**Office** [1] - 1:14
**officer** [4] - 18:23, 24:23, 25:17, 25:19
**Offices** [1] - 1:18
**Official** [2] - 1:23, 32:11
**often** [3] - 23:14, 27:8
**Ohio** [1] - 14:15
**old** [1] - 23:8
**old-style** [1] - 23:8
**once** [1] - 31:3
**one** [14] - 7:22, 12:21, 14:20, 16:12, 16:20, 18:20, 20:2, 21:17, 24:19, 26:1, 26:2, 30:16, 30:17
**opportunity** [5] - 4:15, 5:9, 11:6, 11:12, 17:2
**opposed** [1] - 25:8
**order** [3] - 10:7, 30:10, 30:13
**orders** [3] - 8:7, 13:15, 23:2
**organization** [2] - 14:14, 14:15
**original** [1] - 3:10
**originated** [1] - 19:11
**otherwise** [2] - 13:21, 23:17
**outrageous** [1] - 28:13
**overruled** [1] - 6:22
**overwhelming** [1] - 9:21
**own** [1] - 25:12

**P**

**p.m** [1] - 31:21
**pages** [4] - 4:19, 4:21, 4:22, 11:23
**pain** [2] - 22:17, 22:19
**painting** [1] - 27:25

**panoply** [1] - 23:15
**paperwork** [1] - 2:24
**paragraph** [1] - 14:5
**paramour** [1] - 12:12
**parcel** [1] - 19:14
**parent** [1] - 14:8
**parents** [6] - 18:17, 18:18, 19:21, 20:11, 21:5, 22:10
**parking** [1] - 9:14
**part** [3] - 17:20, 19:14, 24:21
**particular** [3] - 13:25, 15:18, 27:15
**particularly** [1] - 16:22
**party** [4] - 18:16, 18:19, 19:20, 20:11
**passport** [1] - 26:1
**Patterson** [1] - 14:15
**PC** [1] - 22:1
**pending** [2] - 8:17, 8:19
**Pennsylvania** [3] - 18:25, 20:3, 22:11
**people** [1] - 21:12
**perfectly** [1] - 2:11
**period** [2] - 29:12, 30:2
**permit** [1] - 5:12
**permitted** [1] - 21:3
**perpetrate** [2] - 15:5, 16:10
**perpetrating** [1] - 13:5
**persist** [1] - 15:23
**persisted** [1] - 16:5
**persistence** [1] - 18:8
**person** [3] - 20:24, 29:1, 29:15
**personal** [1] - 17:18
**persons** [2] - 12:8, 18:5
**persuade** [1] -

26:18
**phone** [2] - 23:8, 23:9
**physicians** [2] - 14:17, 14:20
**pick** [1] - 22:15
**piece** [2] - 9:12, 10:12
**place** [1] - 30:13
**placed** [1] - 5:19
**placing** [1] - 29:19
**plan** [1] - 12:6
**platform** [1] - 15:20
**point** [8] - 4:13, 8:2, 8:13, 13:11, 13:25, 15:25, 19:4, 24:22
**pointed** [2] - 16:16, 28:7
**pointing** [1] - 26:17
**points** [3] - 21:19, 27:8, 28:20
**Police** [2] - 13:13, 25:17
**police** [4] - 9:6, 25:19, 27:3, 29:11
**position** [5] - 6:25, 8:20, 12:19, 22:20, 29:4
**positions** [1] - 4:8
**possess** [1] - 21:13
**possibly** [2] - 26:18, 27:25
**postmarked** [1] - 12:24
**potential** [2] - 17:6, 25:6
**practice** [1] - 21:16
**preliminary** [3] - 6:20, 31:12, 31:20
**prepared** [1] - 5:11
**presence** [2] - 13:21, 19:12
**present** [3] - 4:9, 5:9, 18:9
**presented** [1] - 19:3
**presumption** [1] - 21:11
**Pretrial** [10] - 3:10, 16:18,

16:21, 20:15, 21:10, 21:19, 22:23, 23:7, 23:10, 24:2
**Pretrial's** [1] - 26:19
**previous** [1] - 8:7
**previously** [1] - 2:21
**primarily** [2] - 3:23, 20:9
**primary** [1] - 4:4
**proceed** [1] - 3:17
**proceeding** [3] - 3:21, 3:25, 7:12
**Proceedings** [1] - 1:21
**proceedings** [3] - 25:11, 32:2, 32:6
**process** [5] - 13:14, 17:13, 17:14, 25:2, 25:22
**PROCTOR** [25] - 1:17, 2:20, 3:5, 3:7, 3:15, 6:18, 11:8, 11:11, 19:19, 19:24, 20:13, 20:16, 20:22, 21:18, 24:7, 24:11, 25:25, 26:11, 30:14, 30:17, 31:2, 31:7, 31:15, 31:19, 31:22
**proctor** [1] - 2:19
**Proctor** [20] - 1:18, 2:20, 3:8, 3:23, 11:5, 11:7, 11:14, 19:18, 20:12, 21:16, 24:10, 24:13, 24:17, 26:9, 26:14, 26:15, 30:12, 31:1, 31:4, 31:14
**Proctor's** [3] - 25:9, 26:23, 27:8
**Produced** [1] - 1:22
**producing** [1] - 28:15
**professional** [3] - 14:7, 14:11, 14:24
**program** [2] - 9:9, 21:24

16:21, 20:15,
**promptly** [1] - 30:25
**proof** [1] - 27:12
**properly** [1] - 22:17
**proposed** [2] - 18:16, 19:20
**proposition** [1] - 18:7
**protective** [1] - 13:15
**provide** [1] - 30:19
**provider** [1] - 19:13
**province** [1] - 25:21
**Public** [3] - 2:21, 3:5, 30:15
**public** [3] - 12:17, 16:6, 17:5
**purport** [1] - 21:21
**purported** [3] - 12:10, 14:11, 25:17
**purportedly** [3] - 12:22, 13:12, 14:13
**purporting** [1] - 12:8
**purposes** [1] - 27:12
**pursuant** [1] - 5:6
**pursue** [1] - 7:16
**pushing** [1] - 7:23
**put** [2] - 11:15, 27:4
**puts** [1] - 24:25
**putting** [1] - 22:20

**Q**

**questions** [4] - 10:25, 11:12, 11:13, 24:11
**quickly** [1] - 24:15
**Quo** [6] - 2:17, 5:15, 14:19, 15:8, 15:15, 19:9

**R**

**racism** [1] - 12:15
**racist** [1] - 25:20
**raise** [1] - 25:4
**rank** [1] - 29:3
**re** [1] - 6:25
**re-assigned** [1] -

6:25
**reached** [1] - 14:19
**reaction** [1] - 7:18
**read** [2] - 4:18, 12:11
**reading** [2] - 26:22, 28:13
**ready** [1] - 3:17
**real** [1] - 23:12
**real-time** [1] - 23:12
**really** [9] - 13:3, 15:6, 16:21, 16:22, 20:8, 21:22, 22:11, 22:20, 24:25
**reason** [1] - 18:18
**reasonable** [1] - 18:4
**reasons** [2] - 4:4, 11:19
**receipt** [1] - 13:23
**received** [5] - 3:10, 13:8, 14:22, 14:23, 15:24
**recent** [1] - 10:3
**recently** [1] - 9:8
**recess** [1] - 32:1
**recommendation** [1] - 26:19
**recommendations** [1] - 16:18
**recommended** [1] - 16:19
**recommends** [1] - 21:10
**reconsider** [1] - 7:20
**record** [10] - 5:22, 11:10, 11:16, 11:17, 14:12, 16:15, 20:6, 24:6, 29:8, 31:18
**Recorded** [1] - 1:21
**recorded** [2] - 32:5, 32:6
**Recording** [1] - 1:21
**recording** [2] - 32:6, 32:7
**records** [2] - 14:4, 14:13
**redacted** [2] - 3:22, 19:6
**redress** [1] - 23:3
**Redwood** [1] -

1:18
**refill** [1] - 22:15
**reflected** [4] - 4:10, 13:23, 14:12, 16:4
**reflection** [1] - 18:7
**reflects** [3] - 14:1, 15:4, 25:10
**refute** [1] - 20:10
**relations** [2] - 13:6, 14:6
**relationship** [1] - 12:11
**release** [2] - 8:16, 24:8
**released** [3] - 4:9, 8:18, 9:8
**releases** [1] - 23:22
**remain** [2] - 7:5, 7:9
**remedied** [1] - 2:25
**remember** [1] - 4:19
**remotely** [1] - 23:6
**remove** [2] - 2:7, 5:18
**Report** [1] - 20:15
**report** [5] - 3:11, 16:21, 21:7, 22:18, 22:25
**reported** [1] - 13:13
**Reported** [1] - 1:23
**Reporter** [2] - 1:23, 32:11
**represented** [2] - 16:1, 30:15
**representing** [1] - 26:16
**reputation** [1] - 25:15
**request** [1] - 21:2
**requested** [1] - 5:6
**require** [2] - 26:25, 30:10
**requirements** [1] - 27:11
**residence** [6] - 5:11, 7:13, 9:8, 19:6, 19:9, 19:12
**residing** [2] - 12:24, 18:24
**resolve** [1] - 15:16

**respect** [1] - 16:18
**respectfully** [1] - 16:20
**respond** [2] - 8:24, 25:25
**responsibilities** [1] - 14:9
**restricted** [2] - 22:20, 22:21
**resulted** [2] - 4:3, 13:14
**retirement** [2] - 24:24, 25:3
**returned** [1] - 8:2
**revision** [1] - 18:16
**Richmond** [2] - 12:25, 13:20
**risk** [5] - 4:6, 4:9, 17:10, 17:18, 20:8
**room** [1] - 7:23
**RPR** [3] - 1:23, 32:5, 32:11
**rules** [1] - 25:5

## S

**safety** [4] - 17:5, 18:5, 24:9
**Sarah** [2] - 12:23, 13:13
**satisfied** [1] - 27:11
**saw** [1] - 27:7
**schedule** [1] - 31:12
**scheme** [3] - 12:3, 13:3, 29:4
**school** [1] - 8:8
**Sciences** [1] - 7:7
**Scranton** [4] - 18:25, 20:2, 20:25, 22:10
**seat** [1] - 11:1
**seated** [5] - 2:4, 2:18, 3:9, 5:25, 6:4
**section** [3] - 18:1, 26:20, 28:20
**see** [12] - 4:15, 15:21, 20:10, 21:11, 21:12, 21:24, 23:5, 23:12, 23:20, 24:2, 25:15, 29:10
**seeing** [1] - 21:25
**seek** [2] - 22:4,

23:3
**seeking** [1] - 4:5
**seem** [1] - 27:23
**sees** [1] - 21:12
**sending** [1] - 12:7
**sense** [1] - 27:17
**sent** [2] - 3:20, 12:22
**separated** [2] - 4:12, 6:11
**separation** [3] - 7:12, 7:16, 27:6
**September** [1] - 12:25
**serious** [2] - 17:17, 28:1
**seriousness** [1] - 29:15
**serve** [1] - 14:8
**served** [1] - 10:11
**service** [1] - 19:13
**Services** [4] - 3:10, 7:6, 16:21, 20:15
**serving** [1] - 18:24
**set** [1] - 31:20
**seven** [2] - 20:3, 21:17
**several** [2] - 12:21, 22:6
**shared** [1] - 13:24
**short** [1] - 31:5
**shoulder** [1] - 29:9
**show** [3] - 10:11, 23:1, 25:5
**showed** [2] - 9:14, 14:17
**shown** [1] - 25:9
**shows** [1] - 13:3
**side** [1] - 23:15
**signal** [1] - 19:13
**significant** [1] - 16:22
**significantly** [1] - 15:4
**simple** [2] - 20:19, 21:4
**sister** [1] - 19:22
**six** [1] - 20:4
**SMITH** [1] - 1:17
**Smith** [5] - 2:21, 3:8, 24:3, 31:8
**someone** [1] - 15:21
**sophistication** [1] - 18:8
**sorry** [1] - 10:20
**sort** [3] - 12:15,

13:3, 22:7
**South** [1] - 1:14
**speaking** [1] - 2:7
**Special** [2] - 2:16, 5:14
**specific** [1] - 14:5
**speculating** [1] - 17:1
**spoofed** [1] - 12:8
**spouse** [1] - 6:5
**stability** [1] - 9:9
**stage** [2] - 27:11, 28:16
**stalking** [2] - 20:20, 27:14
**stand** [2] - 5:14, 32:1
**start** [1] - 27:2
**started** [1] - 27:5
**state** [2] - 5:22, 9:4
**statement** [3] - 5:10, 6:19, 6:21
**STATES** [2] - 1:1, 1:4
**States** [5] - 1:12, 1:14, 2:13, 2:15, 26:20
**status** [2] - 24:25, 25:3
**statute** [1] - 17:9
**stay** [1] - 7:19
**still** [1] - 4:24
**stop** [1] - 9:1
**stopped** [1] - 9:10
**stopping** [1] - 9:6
**Street** [3] - 1:14, 1:18, 1:24
**stretch** [2] - 20:8, 23:14
**strong** [1] - 28:22
**stronger** [1] - 4:7
**student** [1] - 15:13
**stuff** [2] - 22:7, 25:20
**style** [1] - 23:8
**subject** [1] - 12:17
**submissions** [1] - 25:13
**submit** [5] - 11:18, 16:7, 25:1, 25:10, 25:22
**submits** [1] - 4:16
**submitted** [2] - 14:10, 14:25
**substantially** [1] - 15:20

**subvert** [1] - 27:19
**sufficient** [1] - 27:13
**suggest** [4] - 4:7, 18:20, 18:22, 24:8
**suggests** [2] - 13:19, 23:3
**suitability** [1] - 18:19
**SULLIVAN** [1] - 1:13
**Sullivan** [3] - 2:15, 15:24, 16:16
**summarize** [2] - 4:25, 12:2
**summarizes** [1] - 16:11
**summer** [4] - 4:12, 6:12, 6:17, 6:24
**summons** [1] - 10:11
**supervising** [2] - 21:20
**supplement** [1] - 5:2
**support** [3] - 3:22, 27:10, 27:14
**surprising** [1] - 16:24
**surrebuttal** [1] - 26:10
**surrender** [1] - 26:1
**suspect** [1] - 22:5
**suspicions** [1] - 16:3
**swear** [1] - 5:20
**Swensen** [9] - 6:2, 8:15, 9:24, 10:20, 10:25, 27:18, 27:22, 28:5, 28:7
**SWENSON** [1] - 5:21
**Swenson** [3] - 5:23, 27:25, 28:2
**Sword** [2] - 12:23, 13:13
**sword** [3] - 13:5, 13:8, 13:24
**sworn** [1] - 5:21
**system** [9] - 14:8, 23:4, 27:19, 27:20, 28:9, 30:6, 30:7, 30:8

## T

**table** [2] - 2:8, 2:16
**tamper** [1] - 23:20
**target** [1] - 15:24
**telephonic** [1] - 16:2
**teleworking** [2] - 21:1, 23:10
**ten** [1] - 15:25
**term** [1] - 12:4
**terrorism** [2] - 12:4, 23:13
**terroristic** [1] - 4:10
**terrorize** [1] - 30:8
**THE** [75] - 1:1, 1:2, 1:10, 2:3, 2:8, 2:18, 3:2, 3:6, 3:8, 3:13, 3:17, 4:18, 4:22, 5:2, 5:8, 5:13, 5:17, 5:20, 5:22, 5:23, 5:24, 6:20, 8:9, 8:12, 8:14, 9:24, 10:1, 10:2, 10:3, 10:5, 10:6, 10:8, 10:9, 10:14, 10:16, 10:18, 10:22, 10:23, 11:1, 11:7, 11:9, 11:14, 11:21, 16:13, 17:4, 17:9, 17:14, 17:20, 17:22, 17:25, 18:11, 18:13, 19:2, 19:16, 19:23, 20:12, 20:14, 20:18, 21:15, 24:5, 24:10, 24:13, 24:16, 25:24, 26:9, 26:13, 30:16, 30:19, 31:3, 31:8, 31:14, 31:17, 31:20, 31:24, 32:1
**third** [5] - 12:8, 18:16, 18:19, 19:20, 20:11
**Thomas** [1] - 2:15
**THOMAS** [1] - 1:13
**threat** [8] - 17:5, 17:19, 18:9, 28:1, 28:3, 28:4, 29:23

**threatened** [1] - 29:17
**threatening** [2] - 29:17, 30:1
**threats** [1] - 4:10
**three** [1] - 6:10
**throughout** [1] - 4:11
**thrown** [1] - 25:3
**Thursday** [8] - 5:5, 10:4, 13:10, 19:5, 22:15, 31:12, 31:19, 31:21
**today** [3] - 2:16, 3:25, 26:17
**together** [1] - 27:4
**took** [3] - 6:9, 26:24, 28:24
**topsy** [1] - 25:7
**total** [1] - 4:22
**toward** [1] - 7:16
**trace** [1] - 15:9
**transcribed** [1] - 32:6
**Transcript** [1] - 1:22
**transcript** [2] - 32:5, 32:7
**Transcription** [1] - 1:22
**traumatizing** [1] - 9:16
**traveled** [1] - 5:10
**treated** [1] - 22:17
**treatment** [5] - 14:12, 14:18, 14:23, 22:12, 22:18
**trial** [2] - 8:17, 8:19
**tried** [1] - 19:8
**trip** [1] - 13:21
**true** [4] - 25:18, 26:7, 26:8
**trustworthy** [1] - 25:22
**try** [2] - 15:5, 24:2
**trying** [4] - 9:5, 9:9, 16:10, 26:16
**Tuesday** [1] - 10:4
**turn** [1] - 12:16
**turned** [2] - 15:19, 25:7
**turvy** [1] - 25:7
**twice** [1] - 22:25
**two** [6] - 4:4, 4:8, 14:17, 24:14, 27:18, 28:5

**Tylenol** [1] - 22:19

## U

**U.S.C** [1] - 5:7
**ultimately** [2] - 7:25, 14:24
**under** [3] - 5:19, 11:25, 17:9
**Uniformed** [1] - 7:6
**UNITED** [2] - 1:1, 1:4
**United** [5] - 1:12, 1:14, 2:13, 2:15, 26:20
**University** [1] - 7:6
**unwanted** [1] - 12:16
**up** [11] - 2:9, 9:14, 12:20, 16:8, 18:22, 22:15, 24:19, 25:5, 25:9, 28:7, 29:21
**updated** [1] - 30:17
**urgent** [2] - 30:21, 30:23
**uses** [1] - 23:10
**usual** [1] - 21:16
**USUHS** [2] - 8:6, 15:13
**utterly** [1] - 25:18

## V

**vehicle** [1] - 7:22
**vehicles** [1] - 7:21
**verify** [2] - 14:25, 15:3
**version** [1] - 19:7
**versus** [1] - 2:13
**veteran** [2] - 19:25, 29:2
**via** [1] - 32:6
**victim** [5] - 6:19, 11:13, 27:17, 28:20, 30:3
**victims** [11] - 18:11, 20:5, 28:2, 28:6, 29:6, 29:8, 29:16, 29:24, 30:5, 30:9
**violations** [1] - 13:15
**Virginia** [10] - 5:11, 8:2, 12:25,

13:6, 13:22, 14:7, 14:24, 18:24, 20:2, 23:18
**vs** [1] - 1:5

## W

**wants** [1] - 23:7
**Washington** [1] - 6:25
**ways** [2] - 12:21, 15:15
**weapon** [1] - 30:8
**wear** [2] - 2:10
**weeks** [1] - 16:7
**weigh** [1] - 15:1
**weight** [1] - 28:21
**welcome** [1] - 31:8
**whereabouts** [1] - 10:10
**whisper** [1] - 23:23
**whole** [2] - 25:6, 30:6
**wife** [3] - 4:12, 5:6, 18:10
**wifi** [1] - 19:13
**willing** [2] - 14:2, 15:5
**witness** [3] - 5:20, 11:12, 19:5
**WITNESS** [7] - 5:23, 10:1, 10:3, 10:6, 10:9, 10:16, 10:22
**wonder** [1] - 9:5
**word** [1] - 12:14
**workplace** [1] - 15:11
**works** [1] - 31:22
**wrapping** [1] - 17:4
**Wright** [1] - 14:15
**Wright-Patterson** [1] - 14:15
**writing** [1] - 14:18

## Y

**year** [2] - 12:3, 16:9
**years** [5] - 4:11, 6:9, 6:10, 9:11, 21:17